IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EZRA HILL,<br><br>        Plaintiff,<br>v.<br><br>CITY OF HARVEY,<br>COOK COUNTY, ILLINOIS,<br>GREGORY THOMAS,<br>DEPUTY POLICE CHIEF JASON BANKS, and<br>LIAM REARDON,<br><br>        Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Ezra Hill ("Hill") for his Complaint against Defendants City of Harvey ("Harvey"), Cook County, Illinois ("Cook County"), Harvey Police Officers Gregory Thomas (Star No. 819) ("Thomas") and Jason Banks ("Banks"), (collectively "Defendant Officers"), and Cook County State's Attorney Liam Reardon ("Reardon"), (Harvey, Cook County, Defendant Officers, and Reardon are collectively referenced to as "Defendants") as follows:

## INTRODUCTION

1. On March 8, 2017 Ezra Hill was found not guilty of an attempted murder that occurred on March 12, 2014 ("the Alleged Crime"). His trial lasted one day; a jury returned an acquittal after deliberating for 30 minutes.

2. Hill spent the prior 31 months as an innocent, pre-trial detainee in Division IX of Cook County Jail where he was subjected to abhorrent living conditions and the near-constant threat of violence. During his detention, Hill was attacked several times; during one such attack he was stabbed. All the while, the Cook County State's Attorney's Office ("the CCSAO") aggressively urged Hill to accept a plea to a reduced charge. The CCSAO initially offered a plea

deal of 6 years to a co-defendant, Antonio Johnson, if Johnson could get Hill to also agree to accept a 6-year sentence as a "package deal." Hill rejected that offer. On March 6, 2017, the CCSAO offered Hill a plea deal of 27 years, which Hill rejected. On the morning of trial (March 8, 2017), the CCSAO made one last, desperate attempt to avoid trial, offering a plea deal of 6 years. Hill rejected that as well.

      3.      Hill was arrested, charged and tried on three counts of attempted murder, despite the complete lack of physical evidence connecting him to the grave charge. Additionally, Hill's indictment was secured through (a) an unlawfully coerced "confession" by a co-defendant that was fabricated by the Harvey Police Department ("HPD") and the CCSAO; (b) unreliable - and later recanted - eyewitness testimony contradicted by the physical evidence; and (c) a deliberate, woefully inadequate investigation.

      4.      Hill now brings this lawsuit seeking compensation for the injuries he suffered because of the violations of his civil rights that occurred between March 12, 2014 and March 8, 2017.

      5.      The contributing misconduct of the HPD is not novel to Hill's case; the HPD has often been cited for fabricating charges against innocent arrestees and other misconduct.

      6.      The CCSAO is likewise complicit by seeking indictments based on blind reliance on police investigations that are faulty and purposely deficient, and worse, by participating in the fabrication of evidence.

## JURISDICTION AND VENUE

      7.      Hill brings claims pursuant to 42 U.S.C. § 1983 to redress the deprivation of his rights under the United States Constitution and under common law of the State of Illinois.

      8.      This Court has jurisdiction over Hill's federal claims pursuant to 28 U.S.C. § 1331 and over his state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to Hill's claims all occurred within this judicial district. Venue is also proper in this district under 28 U.S.C. § 1391(c)(2) because the Court has personal jurisdiction over all the defendants. Venue may also be proper in this district under 28 U.S.C. § 1391(b)(1) if all defendants still reside in this judicial district.

## THE PARTIES

10. Hill is 30 years old and currently resides in Harvey, Illinois. On March 12, 2014, he was 27 years old and resided in Harvey. Before his incarceration for the Alleged Crime, Hill worked as a driver for trucking companies. As further addressed below, at one time, Hill worked as a booking officer of the HPD.

11. Harvey is a municipal corporation under the laws of the State of Illinois. Harvey is responsible for the acts of its employees while acting within the scope of their employment. At all relevant times Harvey was the employer of the Defendant Officers.

12. Cook County is a governmental entity operating within the State of Illinois, which consists in part of the CCSAO. Cook County is responsible for the acts of its employees while acting within the scope of their employment. At times relevant to this action, Cook County was the employer of Reardon.

13. At all relevant times, Thomas and Banks were HPD officers. Each Defendant Officer is sued in his individual capacity. Each Defendant Officer acted under color of law, and acted within the scope of his employment during the investigation of the crime at issue.

14. At all relevant times, Reardon was a prosecutor with the CCSAO who undertook investigatory actions during the investigation of the Alleged Crime. He is sued in his individual capacity. He acted under color of law, and acted within the scope of his or her employment during the investigation of the Alleged Crime.

## THE ALLEGED CRIME

15. On March 12, 2014, at approximately 10:31 a.m., Eric Bond ("Bond") was driving a stolen Honda Civic ("the Civic") on Center Avenue, just north of East 146th Street in Harvey, Illinois when he spotted a black Oldsmobile Intrigue ("the Intrigue") behind him. Though Hill owned the Intrigue, he was not inside the car at the time, as he had lent it to Andrew White ("White") and Antonio Johnson ("Johnson") earlier that morning. Also in the Civic with Bond were Alquan McReynolds ("McReynolds") and Ahmad Thornton ("Thornton"). Due to a pre-existing conflict between the parties, White and Johnson emerged from the Intrigue and opened fire on the Civic. Allegedly, White fired 6 bullets from a 38 Smith and Wesson Long Nose Revolver and Johnson fired 6 times from a 38 caliber Snub Nose Revolver. Spent shell casings from revolvers were the only ones recovered from the scene of the crime, the interior of the Intrigue or anywhere else.

16. Bond sped off in the stolen Civic after the melee, ultimately colliding with a Ford Mustang at the intersection of East 147th Street and Center Avenue. Bond, McReynolds and Thornton then separately fled the scene of the collision on foot and were each subsequently apprehended by HPD Officers.

17. White and Johnson drove away from the scene and parked in the driveway of White's residence at 14610 Des Plaines Street in Harvey. Thomas and Banks arrived at the White residence roughly 20 minutes later and found only White and Johnson sitting in the Intrigue, which they knew to be owned by Hill.

18. Immediately after White and Johnson were handcuffed and placed in a squad car Thomas removed a Benelli M4 semi-automatic shotgun ("the shotgun") from the trunk of the Intrigue and inspected it. That type of a shotgun ejects shells when it is discharged. Moreover,

when that type of a shotgun has been discharged, it emits a distinct, gaseous odor. When he inspected the shotgun, Thomas did not – and could not - detect that odor.

19. The shotgun was also fully loaded. The HPD inventoried the shotgun as having six live rounds in it, which is the capacity for that particular weapon. Additionally, there was no physical evidence that the shotgun had been fired; not a single shotgun shell was found at the scene of the crime, in the interior of the Intrigue, or anywhere, nor was there a single shotgun pellet mark on the Civic.

20. The results of forensic tests that were run on cartridge casings found at the scene of the crime could not be positively identified or eliminated as having been fired by the two handguns, but found definitively that they *were not* fired by the shotgun. Despite Thomas' acknowledgement to the grand jury that the Civic had been struck "numerous times," there was no evidence that shotgun rounds struck the Civic.

21. Despite the overwhelming physical evidence that the shotgun had not been discharged by anybody on March 12, 2014, Thomas and Banks decided to fabricate the story that not only was the shotgun fired at the Civic, but that it was fired exactly four times by Hill.

22. Hill was never in the Intrigue during the Alleged Crime, he was miles away with his girlfriend, having lent his car to White and Johnson hours earlier so that they could drive to nearby Riverdale to make money shoveling snow. Additionally, the HPD knew that the shotgun was not discharged by anyone during the Alleged Crime. The HPD was gunning for Hill, though, and it was determined to prosecute him for this phantom event with the complicity of the CCSAO.

**DEFENDANTS TARGET HILL FOR THE ALLEGED CRIME**

23. The City of Harvey and its Police Department have exhibited a pattern of bias against Hill. Hill used to work for the HPD as a booking officer. The HPD fired Hill in April

2008 after he was wrongfully arrested on a charge of aggravated unlawful use of a weapon, a charge which was subsequently dismissed.

24. Thomas approached White in the Markham Courthouse on the morning of Hill's 2017 criminal trial and told him that if they couldn't make the attempted murder charge against Hill stick, they would "get" Hill on something else.

25. In 2014, Defendants were motivated and determined to conspire to fabricate evidence and coerce false confessions. The latter was demonstrated though the intense pressure that the HPD and CCSAO put on White, which ultimately secured an indictment of Hill.

26. Additionally, in an effort to obfuscate evidence, the HPD eventually "lost" Hill's automobile, despite having impounded it. It still remains missing.

27. Upon arriving at the police station, White and Johnson participated in an identification lineup and then were subsequently separated: Johnson was placed in a cell, White in an interrogation room, where he would sit for the next 11 hours.

28. Thomas, Banks and Reardon left White alone in that interrogation room without an attorney or phone call while they concocted their scheme to fabricate their case against Hill. It wasn't until after 7 p.m. that the HPD informed White's mother – Elizabeth Kellogg ("Kellogg") – that her son was detained. The Defendants decided to manipulate Kellogg in an attempt to legitimatize its already-corrupted investigation.

29. Kellogg was allowed to sit in the interrogation room with her son once, roughly an hour and a half after she arrived, whereupon she witnessed Thomas and Reardon pressure her fifteen-year-old son, repeatedly insisting that he go along with their story: that Hill was in the car and fired the shotgun four times. They told her that cooperation would result in leniency for White. Thomas and Reardon prepared a false statement for Kellogg to sign, which she did at 12:55 a.m. She was never allowed to speak with her son alone.

30. Thomas and Reardon prepared a statement for White to sign at 12:22 a.m., on Thursday, March 13, 2014 that implicated Hill. White did not read the statement, and simply wanted a reprieve after several long, threatening interrogations. White repeatedly told Thomas, Banks and Reardon, though, that the shotgun was never removed from the trunk, let alone been fired; moreover, White insisted that Hill was not with them.

31. Thomas and Reardon were adamant that White agree to their version of the story, in which he, Johnson and Hill fired three separate guns at the Civic, despite the contradictory evidence. Banks candidly told White that they intended to tie the alleged crime to Hill, at one point imploring White to call Hill on his cellular phone and entrap him. Thomas and Reardon threatened White that he could be tried and sentenced as an adult on multiple counts of attempted murder, despite being a minor. Ultimately White was promised – and granted – a reduced, juvenile sentence for his "cooperation."

32. Johnson was never questioned. He was never offered the opportunity to speak with an attorney or make a phone call. He sat in a cell for over 11 hours, during which he was never asked to give a statement or interview that might corroborate or challenge the version of the story in White's statement. Upon securing the signatures of White and Kellogg, Johnson was informed that he was going to be charged with attempted murder.

33. Johnson would have stated that he was with White on the morning of the shooting, but that Hill was not there.

34. Hill could not be located until September 3, 2014, whereupon he was arrested based on a warrant for attempted murder. By that point, Bond, Thornton and McReynolds had all testified before grand juries, each offering testimony that seriously called into question Defendants' version of the Alleged Crime. Despite the objective flimsiness of the evidence, the CCSAO gave felony approval to charge Hill with attempted murder.

35. Hill would not go to trial until 31 months later, all the while maintaining his innocence.

## THE STATE'S CASE

### A. Physical Evidence

36. At no point did the HPD identify or produce any physical evidence that could link Hill to the crime, let alone aid the CCSAO in its misguided prosecution. Not a single fingerprint, serology, DNA, ballistic or any other evidence surfaced that could implicate Hill. Worse, the HPD purposely neglected fundamental investigative practices that would have quickly, and easily debunked Thomas' "shotgun fired four times" fiction.

37. Defendants never tested the shotgun to confirm or refute the claim that it was recently fired, nor did they test the shotgun for fingerprints or DNA to demonstrate whether Hill ever handled the weapon.

### B. Alquan McReynolds

38. Thomas and Reardon interviewed McReynolds at approximately 5:03 on the evening of March 12, 2014, wherein Thomas noted in his unsigned Police Continuation Report ("report") that McReynolds identified Johnson and White, but that "he did not see very clearly" another passenger in the Intrigue. McReynolds allegedly stated that the third person "appeared to be" Hill.

39. The McReynolds report claimed that all three suspects in the car exited the vehicle with guns drawn, and that "possibly" Hill was standing near the opened rear driver's side door.

40. McReynolds thoroughly contradicted the report prepared by Thomas when he testified in front of a grand jury on March 25, 2014 that (a) he did not know who else was in the car with White and Johnson and, worse (b) it was Thomas who instructed him to implicate Hill:

"You want me to tell it like, yeah, yeah, he [Thomas] told me to pick out E [Ezra Hill], because I didn't know E too well. He told me to pick out E."

41. McReynolds testified that only White and Johnson emerged from the Intrigue and fired on the Civic.

42. McReynolds also testified that after identifying White and Johnson in a lineup, he was then instructed by Thomas and Banks to pick Hill out of a photo composite with pictures of Hill and five other men. McReynolds admitted to not knowing Hill well, having seen him maybe twice before; Thomas instructed that he point to him when provided with the photo advisory form by Banks.

43. On the Grand Jury witness stand, when asked directly if he actually saw Hill shooting at him, he responded "no." When asked if he saw Hill in the car, he responded "I don't think I saw him in the car."

44. Defendant Ramirez elicited the aforementioned testimony from McReynolds. The CCSAO declined to call McReynolds as a witness in Hill's criminal trial.

C. **Ahmad Thornton**

45. Thomas and Reardon conducted an interview with Thornton next, at 5:17 that evening. According to another unsigned report prepared by Thomas, Thornton observed White driving the Intrigue, with Hill in the back seat – of his own car – and Johnson "standing next to the black Oldsmobile on the passenger's side…and pointing a black handgun toward the vehicle [sic] was occupied by him, Bond and McReynolds, Alquan." Thornton's report contradicted the McReynolds reports, the latter allegedly claiming that three individuals were outside of the car firing guns at the Civic. Thornton then stated, allegedly, that he ran away to avoid being shot by Johnson, White and Hill.

46. The Thornton report that Thomas submitted was thoroughly contradicted by Thornton's grand jury testimony on March 25, 2014, in which at no point could he make an identification of a potential third person in the Intrigue, only White and Johnson. He also stated again that only one individual – Johnson – exited the Intrigue.

47. Thornton also admitted to the grand jury that he could only recall "about like 10, 11" shots fired from the Intrigue, and relayed that to Thomas. Thomas insisted, though, that 16 shots were fired – 12 from the revolvers, four from the shotgun - despite the contradictory testimony and the lack of any physical evidence that the shotgun was discharged. Thomas also made a point to include an uncorroborated detail into his report, claiming that Thornton said that "some of the shots were louder than other shots."

48. At no point in Thornton's grand jury testimony did he identify Hill as a participant in the crime; Thornton's only testimony about Hill was merely that he knew who Hill was, through a mutual acquaintance.

49. Thornton's alleged statements to Thomas and Reardon were so thoroughly contradicted by his grand jury testimony that the CCSAO declined to call him as a witness in Hill's trial.

**D. Eric Bond**

50. Bond was interviewed last, and was the only eyewitness to testify at Hill's trial. Bond admitted to Thomas that on the morning of March 12, 2014 he gave a fake name to the arresting officer, Officer Jeffery Tibbs ("Tibbs"), because he had an outstanding warrant. After unpersuasive statements from Thornton and McReynolds, Thomas and Reardon knew that Bond could be pressured to give statements and testimony that implicated Hill. Bond was a juvenile with prior convictions and an outstanding warrant. Moreover, he was apprehended with a stolen vehicle and marijuana.

51. Bond was not charged with driving a stolen vehicle or possession of marijuana, and his testimony ultimately became the centerpiece of the CCSAO's case against Hill, testimony that the jury found improbable and far-fetched.

52. Thomas' report summarized his interview with Bond, wherein the latter allegedly claimed that he observed White exit from the driver's seat of the Intrigue, Hill exit from the driver's-side back seat and Johnson exit the front passenger door, all three armed and firing at the Civic. Hill allegedly had a "large gun."

53. State's Attorney Prosecutors John Henning and Matt Howroyd attempted to buttress Bond's testimony at Hill's trial with testimony from Tibbs and Thomas. Tibbs was not asked a single question about Hill, but curiously only gave testimony undermining the credibility of Bond. Tibbs testified that, upon detaining Bond, that: (a) Bond gave a fake name, (b) Bond "wasn't cooperative, and (c) he recovered a sock containing five live .38 rounds "right where [he] found" Bond.

 **E.** **Andrew White**

54. After interviewing Bond, Thomas and Reardon kept White – then 15 years old – detained another 7 hours before presenting him with a false statement to sign. When White repeatedly insisted to Thomas and Reardon that Hill was not present, and that the shotgun had never even been removed from the trunk, they threatened that he would be tried and sentenced as an adult on multiple counts of attempted murder if he didn't abide by their version of events. White already had two other criminal charges pending against him at the time. The defendants used these as leverage over White to secure his "cooperation."

55. White ultimately agreed to go along with Thomas and Reardon's story, signing a false, coerced confession at 12:22 a.m. that also implicated Johnson and Hill. White didn't even read it prior to signing it. For his "cooperation," White ultimately entered a guilty plea to a

single reduced charge of aggravated discharge of a firearm by a minor, as well as a guilty plea for being in possession of a stolen vehicle on a separate charge; the CCSAO agreed to dismiss the final outstanding criminal charge by entry of a *nolle prosecuqui*. White ultimately served a nine-month sentence at a juvenile detention facility for the three crimes – 22 months less than Hill would serve as a pre-trial detainee.

56. White's plea deal was entered on April 24, 2015 in the Juvenile Justice and Child Protection Department of Cook County. Only 16 years old at the time, White agreed to the CCSAO's version of events, as read into the record by State's Attorney Maurice Alayo. On the stand, White stated, candidly, that his mother was sick, and that she just wanted this to be over with. With that in mind, he would "just do what [he had] to do."

57. Alayo asserted that, if called, Eric Bond would testify that the occupants of the Intrigue were Johnson, White and Hill, but that only Johnson and White exited the vehicle and shot at him. Curiously, Alayo also conceded that if called, *neither* McReynolds *or* Thornton would be able to offer testimony inculpating Hill, as they could only identify Johnson and White emerging from the car and firing at them.

58. Despite a "signed confession" that inculpated Hill, the CCSAO did not call White to testify at his criminal trial, same as Thornton and McReynolds.

59. No later than March 25, 2014, the CCSAO knew that none of the three passengers in the Civic could positively identify Hill as being both (a) in the Intrigue at the time of the Alleged Crime, and (b) firing the shotgun.

60. Undeterred by the lack of any credible evidence supporting Hill's involvement in the Alleged Crime – and physical evidence directly contradicting Hill's involvement -- the HPD and CCSAO continued in their prosecution of Hill.

## Count I - 42 U.S.C. 1983
### Federal Malicious Prosecution and Due Process

61. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

62. Defendants Thomas, Banks and Reardon, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Hill of his constitutional rights to due process and a fair trial.

63. Said Defendants caused Hill to be maliciously prosecuted for a crime for which he was innocent that resulted in the deprivation of his liberty in violation of his procedural and substantive right to due process guaranteed by the Fourteenth Amendment and right to be free of unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments.

64. Said Defendants caused Hill to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. Defendants aggressively pursued Hill's criminal prosecution for attempted murder despite the lack of any shred of supporting physical evidence or any probable cause other than the statements based upon their fabrication of testimony evidence to falsely implicate him.

65. Said Defendants fabricated eye witness statements in their reports and a confession by a co-defendant, as well as manipulated photo lineups for identification by instructing at least one individual to falsely implicate Hill. These efforts misled and misdirected the criminal prosecution to the detriment of Hill.

66. The fabricated evidence violated Hill's due process when it was used to deprive him of his liberty, then served as illegitimate probable cause for his arrest, detention, indictment, and fraudulent criminal trial.

67. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Hill's favor after the State was thoroughly incapable of convicting Hill following a jury trial.

68. Defendants accused Hill of grave criminal conduct despite knowing that those accusations were without legitimate probable cause, or reasonably should have known that any "corroborating eyewitness testimony" was beyond incredible under the circumstances.

69. As a result of this violation of his Fourth and Fourteenth Amendment constitutional rights, Hill suffered injuries, including but not limited to his loss of liberty and emotional distress.

## Count II - 42 U.S.C. 1983
## Conspiracy to Deprive Hill of His Constitutional Rights

70. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

71. Defendants, acting within the scope of their employment and under color of law, decided to falsely implicate Hill for an attempted murder and deprive Hill of his constitutional rights, including but not limited to his rights to due process and a fair trial, and the right to be free from evidence fabricated against him and subsequently use to indict, detain and bring him to trial.

72. Defendants further conspired to deprive Hill of potentially exculpatory information to which he was lawfully entitled and which would have led to him not being charged if they had simply performed fundamental investigative methods.

73. Defendants, in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

74. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

75. Defendants willfully conspired with malice and/or reckless indifference to the rights of Hill.

76. Hill's rights were violated, and he suffered physical harm, financial damages, and severe emotional distress and anguish as a direct and proximate result of the Defendants' illicit prior agreements set forth above.

### Count III - 42 U.S.C. 1983
### *Monell* Policy Claim Against Harvey

77. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

78. At all times relevant, Defendant Harvey's municipal policy makers with final policymaking authority ad HPD supervisors ratified, condoned, and facilitated the following policies, practices, and customs within the HPD:

(a) Conducting unlawfully coercive interrogations of witnesses, suspects and arrestees to obtain confessions and false implication of others;

(b) Unlawfully manipulating juveniles and teenagers to falsely confess and falsely implicate others, including by utilizing the unlawful tactics discussed above;

(c) Producing false reports, and giving false statements and testimony about interrogations, confessions, and witness statements;

(d) Pursuing and obtaining prosecutions and detentions based on statements obtained through unlawful interrogations; and

(e) Failing to pursue legitimate, potentially exculpatory evidence.

79. As a result of Harvey and the HPD's policies and practices described above, members of the HPD, including the Defendant Officers, acted with impunity when they violated citizen's civil rights, including Hill's.

80. Harvey's failure to train, supervise, and discipline Defendant Officers effectively condone, ratified, and sanctioned these Defendant Officers' violation of Hill's constitutional rights.

81. Harvey's policies and practices discussed herein were consciously approved by Harvey's policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

82. Defendant Officers acted pursuant to the HPD's policies and practices described above.

83. Harvey maintained and implemented the HPD's policies and practices described above with deliberate indifference to Hill's constitutional rights.

84. Hill's rights were violated, and he suffered physical harm, financial damages, and sever emotional distress and anguish as a direct and proximate result of Harvey's policies, practices and customs.

85. Harvey is liable for the Defendant Officers' misconduct.

**Count IV - State Law Claim**
**Respondeat Superior**

86. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

87. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the HPD acting at all relevant times within the scope of employment and under color of law.

88. Defendant Harvey is liable for Hill's damages (and any award of attorneys' fees) that were caused by the misconduct of the Defendant Officers and any unidentified Officers of the HPD.

### Count V - State Law Claim
### Indemnification

89. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

90. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

91. Harvey must indemnify the Defendant Officers for all judgments entered against them.

92. Cook County must indemnify Reardon for all judgments entered against him.

### Count VI - State Law Claim
### Civil Conspiracy

93. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

94. Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

95. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity in furtherance of the conspiracy.

96. The misconduct described was undertaken by Defendants with malice, willfulness and reckless indifference to the rights of Hill.

97. Hill suffered damages, including severe emotional distress and anguish as a proximate result of Defendants' misconduct and conspiracy to engage in misconduct.

- 18 -

## Count VII - State Law Claim
## Malicious Prosecution

98. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

99. As described above, the Defendant Officers and Reardon caused Hill to be improperly subjected to judicial proceedings for which there was no legitimate probable cause by knowingly providing falsified statements to ensure that Hill would be arrested and prosecuted for a crime that he was innocent of.

100. Defendants Thomas and Reardon coerced false statements that implicated Hill in a crime that he did not commit; Thomas and Banks manipulated a photo identification; the CCSAO relied on flimsy and ultimately recanted eyewitness testimony at trial; and the Defendant Officers and Harvey produced police reports that were conspicuously devoid of routine investigative methods that would have quickly debunked the prior "inculpatory" statements.

101. All such proceedings were terminated in Hill's favor.

102. The proceedings were instituted and continued maliciously, resulting in injury. The Defendant Officers and Reardon acted with malice, willfulness and reckless indifference to Hill's rights.

103. Hill sustained and continues to sustain injuries, including but not limited to physical injury, loss of liberty and pain and suffering because of Defendants' misconduct.

## JURY DEMAND

Plaintiff Hill demands a trial by jury.

Dated: June 22, 2017

Respectfully submitted,

*/s/ Paul K. Vickrey*
Paul K. Vickrey
Dylan M. Brown
Gretchen L. Schmidt
Vitale, Vickrey, Niro & Gasey
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 236-0733
vickrey@vvnlaw.com
dbrown@vvnlaw.com
schmidt@vvnlaw.com
***Attorneys for Plaintiff***