IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EZRA HILL,<br><br>       Plaintiff,<br>v.<br><br>CITY OF HARVEY,<br>COOK COUNTY,<br>GREGORY THOMAS,<br>JASON BANKS,<br>LIAM REARDON, and<br>ED MURILLO<br><br>       Defendants. | Case No. 1: 17-cv-04699<br><br>Honorable Charles P. Kocoras |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO THE MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CITY OF
HARVEY, GREGORY THOMAS AND JASON BANKS**

Paul K. Vickrey
Patrick F. Solon
Gretchen L. Schmidt
Dylan M. Brown
Vitale, Vickrey, Niro Solon & Gasey LLP
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
schmidt@vvnlaw.com
dbrown@vvnlaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 3

    A.    The Shooting ................................................................................................ 3

    B.    The HPD Targets Hill ................................................................................. 4

    C.    Defendants Coerce White to Say That Hill Fired the Shotgun .............. 4

    D.    No Physical Evidence Links Ezra Hill to the Shooting ......................... 6

    E.    Thomas Creates False Interview Reports Implicating Hill .................... 7

    F.    Bond Gets A Pass After Signing A Statement Placing Hill At The Scene ............ 7

    G.    The Photographic Lineup ........................................................................... 8

    H.    CCSAO And Thomas Falsely Claim That
            A McDonald's Surveillance Video Implicates Hill .............................. 9

    I.    Thomas' False Grand Jury Testimony .................................................... 11

III.  ARGUMENT ................................................................................................... 11

    A.    Hill Has a *Fourth Amendment* Claim Under 42 U.S.C. § 1983 Because
            Defendants Put Him in Jail for 30 Months Without Probable Cause ................... 11

    B.    Due Process Does Not Apply After *Lewis* ........................................... 16

    C.    Hill Has a Claim for Malicious Prosecution Under Illinois Law ......... 17

    D.    Defendants' Other Arguments Are Not a Basis for Summary Judgment ............ 17

IV.   CONCLUSION ................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States*,
    721 F.3d 418 (7th Cir. 2013) .................................................16

*Askew v. City of Chicago*,
    440 F.3d 894 (7th Cir. 2006) .................................................16

*Chelios v. Heavener*,
    520 F.3d 678 (7th Cir. 2008) .................................................13

*Coleman v. City of Peoria*,
    925 F.3d 336 (7th Cir. 2019) .................................................13, 14, 17

*Franks v. Delaware*,
    438 U.S. 154 (1978).................................................18

*Hart v. Mannina*,
    798 F.3d 578 (7th Cir. 2015) .................................................14, 15

*Hurt v. Wise*,
    880 F.3d at 842-843 ................................................. *passim*

*Juriss v. McGowan*,
    957 F.2d 345 (7th Cir. 1992) .................................................13

*Kuri v. Folino*,
    2019 US Dist. LEXIS 151304 (N.D. Ill. Sept. 5, 2019) .................................................14, 15, 16

*Lewis v. City of Chicago*,
    914 F.3d 472 (7th Cir. 2019) ................................................. *passim*

*Manuel v. City of Joliet*,
    137 S.Ct. 911 (2017), 903 F.3d 667 (7th Cir. 2018)................................................. *passim*

*Maxwell v. City of Indianapolis*,
    998 F.2d 431 (7th Cir. 1993) .................................................13

*Norris v. Ferro*,
    2009 U.S. Dist. LEXIS 32722 (N.D. Ill. 2009) .................................................16

*Reynolds v. Jamison*,
    488 F.3d 756 (7th Cir. 2007) .................................................14

*Tolan v. Cotton*,
    572 U.S. 650, 134 S.Ct. 1861 (2014) ....................................................................13

*Whitlock v. Brueggemann*,
    682 F.3d 567 (7th Cir. 2012). Dkt. 50 ...............................................................17

*Williams v. City of Chi.*,
    No. 17 C 5186, 2020 U.S. Dist. LEXIS 42875 (N.D. Ill. Mar. 12, 2020) ............13, 14, 16, 18

*Williams v. City of Chicago*,
    2018 U.S. Dist. LEXIS 92515 (N.D. Ill. June 1, 2018) .........................................13

**Statutes**

745 ILCS 10/1-210 ...................................................................................................18

42 U.S.C. § 1983 .................................................................................................11, 17

Plaintiff, Ezra Hill, now submits his Response In Opposition to the Motion for Summary Judgment by Defendants City of Harvey, Gregory Thomas and Jason Banks.

## I.  INTRODUCTION

On March 12, 2014, Andrew White and his cousin, Antonio Johnson, were driving a car borrowed from Plaintiff Hill when they encountered three teens in a stolen Honda Civic.  White and Johnson had a running feud with the individuals in the Civic; they both fired revolvers at them, damaging the car but missing its occupants.  On March 20, the Cook County State's Attorney's Office ("CCSAO") approved an arrest warrant for Hill for attempted murder, and on September 4, 2014, Hill was charged with three counts of attempted murder.  There was no physical evidence linking Hill to the shootings; indeed, the physical evidence conclusively contradicted Defendants' false narrative that Hill had fired a shotgun during the incident.

The Harvey Police Department ("HPD") previously fired Hill after he was wrongfully arrested on a charge which was ultimately dismissed.  Since then, the HPD had exhibited a pattern of bias against Hill; for example, at Hill's criminal trial, Defendant Thomas told White: "We didn't get your boy [Hill], but we're going to get him on something." (SAF ¶¶3-4).  In their zeal to charge Hill, Defendants falsified reports and coerced a false confession implicating Hill from a juvenile (White) to create a narrative that was contradicted by the physical evidence, including a McDonald's surveillance video which was never disclosed to Hill's criminal counsel.  After spending nearly two and a half years in Cook County Jail, Hill was acquitted in a one-day trial and a 30-minute jury deliberation. (SAF ¶5).

There was never probable cause to charge Hill.  After being held for 13 hours, White, a juvenile, signed a statement at Defendants' repeated urging stating that Hill had fired a Benelli automatic shotgun (belonging to Johnson, found in the trunk of the car) four times during the

incident. Defendants knew that this statement was false – White had repeatedly protested that Hill was not present, and Defendants knew that the fully-loaded shotgun had not been fired. White signed the statement after Defendants threatened to charge him as an adult and promised a deal on a lesser charge. (SAF ¶¶29, 32). Defendant Reardon admitted that such circumstances rendered the statement "untrustworthy." (SAF ¶¶29, 30, 32).

Defendant Thomas also falsified his interview reports of the three victims, attempting to implicate Hill as a participant in the shootings. (SAF ¶¶46, 49, 53). Each such falsified report was materially contradicted by later signed statements and grand jury testimony. (SAF ¶¶47, 49, 54). One of the three – juvenile Eric Bond, a convicted felon on probation for attempted hijacking and who was wanted on an outstanding warrant was the most vulnerable to coercion and the least credible. Bond eventually signed a statement that he purportedly saw Hill in the car (but not shooting); in exchange, Bond was not charged with driving a stolen car (a felony), possessing ammunition and marijuana; according to Defendant Reardon, such a deal rendered the statement "untrustworthy." (SAF ¶¶52, 55, 56).

The Harvey Defendants knew that the statements were false; they knew that the shotgun had never been fired, and they personally saw only White and Johnson driving the car before their arrest. (SAF ¶¶20, 36, 37). The CCSAO knew that the signed statements of White and Bond were false, as ASA Reardon was an active participant in creating them. (SAF ¶¶30, 55). That is why the CCSAO twice rejected Thomas' requests for a warrant for Hill's arrest, first on March 12 and later on March 17. (SAF ¶38). Then on March 20, 2014, Thomas gave the CCSAO a McDonald's surveillance tape, falsely claiming that it showed Hill with the two shooters immediately after the shooting. (SAF ¶42). ASA Murrillo and the CCSAO played along with the charade are falsely reported that Hill is seen on the video with the two shooters, and approved the arrest warrant for Hill. (SAF ¶40). The video only shows random people with dark skin ordering food. Defendants

knew that their statements about the video were false, so after the warrant issued, they essentially buried the video. The video was not presented at Hill's trial, nor was it ever disclosed to Hill's defense counsel. (SAF ¶45).

On September 16, 2014, Thomas testified before the grand jury that Hill had pointed a firearm at the victims and shot at them, false testimony which resulted in a true bill indictment against Hill.

## II.    BACKGROUND

In 2014, Plaintiff Ezra Hill was a 27-year old truck driver living in Harvey, Illinois. Prior to driving a truck, Hill had worked as a civilian booking officer for the Harvey Police Department ("HPD") and had been a member of the Army Reserves. (SAF ¶1).

### A.    The Shooting

On the morning of Wednesday, March 12, 2014 at approximately 10:31 a.m., Eric Bond was driving a stolen Honda Civic with his friends Alquan McReynolds and Ahmad Thornton near the intersection of 146th Street and Center Avenue, in Harvey. The three teens noticed a black Oldsmobile behind them, which was occupied by Andrew White (also known as "Chicky") and his cousin Antonio Johnson (also known as "Shady"). (SAF ¶¶6-7). Due to a preexisting conflict, White and Johnson exited the Oldsmobile and opened fire with handguns, striking the Civic multiple times and blowing out the back window. The only spent shell casings recovered at the scene were linked to handguns. (SAF ¶¶8-9).

Bond sped off, crashing into another car a block away. Bond, McReynolds, and Thornton then fled the Civic on foot but were apprehended by the HPD. (SAF ¶10). Immediately after the shooting, White and Johnson drove to a nearby McDonald's, then returned to White's family's residence at 14610 S. Des Plaines. White and Johnson had borrowed the Oldsmobile from Hill; they never saw Hill on March 12, 2014. (SAF ¶¶12-13).

### B.     The HPD Targets Hill

Defendants Thomas and Banks responded to the scene at 147th and Center Street after receiving a call of shots fired.  Banks testified that they relocated to the house on Des Plaines because he knew that White and his mother lived there.  (SAF ¶¶14-16).

Thomas and Banks arrived at 146th and Des Plaines at "10:45 to 11:00." (SAF ¶19).  Banks spotted the Oldsmobile as it was traveling toward the house, and he only saw *two* individuals in the car.  (SAF ¶20).  They encountered White and Johnson in the Oldsmobile in the driveway of the White residence and arrested them.  (SAF ¶21).  Thomas and Banks then searched the Oldsmobile and found handguns inside and a fully loaded Benelli shotgun in the trunk.  (SAF ¶22).  Johnson had purchased the shotgun a week earlier, and on the morning of March 12 he placed it in the trunk of the Oldsmobile, where it was later discovered by Thomas and Banks. Johnson confirmed that the shotgun had not been fired that day, or ever.  (SAF ¶23).  Thomas ran the license plate on the Oldsmobile and learned it belonged to Hill.  (SAF ¶24).

Defendants learned at Hill's April 10, 2019 deposition that Hill's late boxing coach referred to Hill as "E ROC."  At his April 16, 2019 deposition – just six days later – Banks falsely claimed that Bond told him that "that Little Chicky and E Rock were shooting at him."  This alleged statement is not memorialized in any written report.  (SAF ¶17).  Banks also falsely testified that he heard White say that "E Rock" was with him.  (*Id.*).  There is no record of this alleged statement either. (SAF ¶18).

### C.     Defendants Coerce White to Say That Hill Fired the Shotgun

White was 15 on the day of the shooting and was held for thirteen hours before he ultimately signed a statement implicating Hill at 12:22 a.m. that was prepared by ASA Reardon and Thomas.  (SAF ¶28).  Prior to that, Thomas had spent "quite a bit of time" with White over his thirteen-hour detention but did not document his interview(s) in a report as he had for other

witnesses in the case. This was contrary to HPD policy. (SAF ¶31).

Thomas, Banks and Reardon all implored White to implicate Hill in the shooting and state that Hill fired four rounds from the shotgun, despite White's insistence that Hill was not involved. As White testified:

> Q: Did you tell [Banks]s he wasn't there that day?
> A: Yeah, I told him he wasn't around me. I never seen him at all that day.
> Q: Did you tell him he wasn't in the car?
> A: Yeah, I told him he was not in the car.
> Q: Did you tell Thomas that he wasn't in the car?
> A: ***I told Thomas he [Hill] wasn't in the car***
> *     *     *     *
> Q: ***And at some point did Thomas and Reardon tell you that Ezra Hill shot four shots*** out of the shotgun?
> A: ***Yeah. Thomas was just saying he know he shot four shots. I'm like four shots? I'm like the gun was never used.***
> Q: You told Thomas that the gun was never used?
> A: I said the gun was never used.
> ***Q: But Thomas told you that Ezra Hill shot the gun four times?***
> ***A: Uh-huh. Yes. He asked me to say he shot it four times, but I was like he was never with me.*** I never seen him that morning or afternoon, none of that. I was in the police station. Never seent him. Never talked to him that morning.
> *     *     *     *
> Q: And they told you that you need to tell them where Ezra Hill is, correct?
> A: No. Yeah, Banks was telling me I need to tell them where Ezra Hill at.
> *     *     *     *
> Q: ***Whose idea was it for you to say that Ezra Hill shot the Benelli shotgun four times during the shooting?***
> *     *     *     *
> A: ***Banks, Sergeant Banks.***

(SAF ¶29 (emphasis added).

Reardon, Thomas, and Banks threatened White that he could be charged as an adult, despite his age, and that he could get a deal if he would cooperate with their story:

> Q: Did State's Attorney Reardon threaten to charge you with attempted – three counts of attempted murder as an adult?
> A: Yeah, they were trying – they were trying to tell me at first, and then my mama started crying. Then that's the second time – when Thomas came in, it was like he was going to talk to the State's attorney because of my age and month and range, they were going to try to see what was going on and things like that.
> Q: So did Thomas tell you he could get a deal for you if you went along?

| A: | Yeah. |
|---|---|

               \*     \*     \*     \*

Q: Did Reardon tell you that you would get a lesser charge? You wouldn't be charged as an adult if you cooperated?

A: Uh-huh.

Q: That's yes?

A: Yes.

               \*     \*     \*     \*

Q: And at some point did they say you would not be charged as an adult but you'd get some sort of lesser deal if you signed the statement?

A: Yeah, that's what Banks was saying. Like we came back in, everything typed up, like we decided we went through the paperwork and we ain't going to charge you as an adult because we feel you was put to it, this and this. They were saying all types of stuff. Then my mom was saying, Thank, this and that. Thank you, Lord. And I just signed it.

(SAF ¶30). According to the signed statement, Hill fired the automatic shotgun four times during the incident. (SAF ¶28). Defendants knew that the statement they had coerced White to sign was false; among other things, they knew that the fully loaded shotgun had not been fired. Defendant Reardon admitted that any statement obtained by threats or promises would be "untrustworthy." (SAF ¶32). In exchange for White's agreement to the statement implicating Hill, he was allowed to enter a single guilty plea to a reduced charge of aggravated discharge of a firearm by a minor. (*Id.*).

### D. No Physical Evidence Links Ezra Hill to the Shooting

Reardon didn't see any physical evidence of the shotgun being fired but refused to say whether he asked if any such evidence existed. (SAF ¶34). It was not relevant to Banks whether the recovered shotgun was fully loaded, nor did he make any effort to see if it had been fired. (SAF ¶35). Banks never saw any holes created by a shotgun pellet (*Id.* at p. 81), nor was he aware of *any* physical evidence linking Hill to the shooting. Thomas admitted that "there was never any evidence given to [him] that indicated that the Benelli shotgun had ever been fired." (SAF ¶36).

### E.    Thomas Creates False Interview Reports Implicating Hill

Thomas interviewed McReynolds at approximately 5:03 the evening of March 12.  In his report of that interview, Thomas falsely placed Hill at the scene:

> McReynolds also stated that he observed "Lil Chicky" (later identified as White, Andrew) and another male/black suspect who he did not see very clearly, but appeared to be "E" (also known as Hill, Ezra) exit and stand outside of the black Oldsmobile (White standing near the opened driver's door and possibly Hill sanding[sic] near the opened rear driver's side door) both with guns in their hand. ...

(SAF ¶46).  The statement about seeing an armed individual who "appeared to be" Hill was inconsistent with every other statement attributed to McReynolds, including the signed statement that he gave only hours later to Thomas and Reardon.  (SAF ¶47).

Thomas' 5:17 p.m. interview of Thornton likewise falsely placed Hill at the scene: "Thornton then observed a black Oldsmobile Intrigue (which he observed "Lil Chicky", A.K.A White, Andrew driving and "E", A.K.A Hill, Ezra as a rear seated passenger)…."  Thornton's placement of Hill in the car was conspicuously absent from the signed statement that he gave to Reardon and Thomas only hours later.  Reardon conceded: "***Mr. Thornton's statement does not indicate that your client was there.***"  (SAF ¶49) (emphasis added).  Thornton's grand jury testimony never identified Hill as being at the scene of the crime, and Thornton confirmed that his testimony was consistent with the statement he gave to Thomas on March 12.  (SAF ¶50).

### F.    Bond Gets A Pass After Signing A Statement Placing Hill At The Scene

HPD Officer Jeffrey Tibbs detained Bond two blocks from the site of the collision. Bond provided Tibbs with a false name and "refused to cooperate" because he had an outstanding warrant.  Tibbs also recovered from Bond "seven small ziplock bags each containing" marijuana, and found a sock filled with ammunition "right where" Bond was located.  (SAF ¶51).  Bond was arrested for stolen vehicle possession (a felony) and resisting arrest.  (SAF ¶55).

Thomas' interview with Bond occurred at approximately 5:25 that evening on March 12.

Thomas' report states that Bond saw Hill shooting at him with a "large gun," a "bump:"

> He saw "E" (later identified as Hill, Ezra) black Oldsmobile Intrigue [sic] pull behind them (Bond advised R/D that he has been on high alert for "E" and "Lil Chicky" A.K.A White, Andrew because they rob [sic] him at gun point approximately a week ago and because "E" has been shooting at him for the past four days).
>
> * * * *
>
> He then observed "Lil Chicky" exit from the driver's seat, "E" exit from the rear driver's side door and "Shady" A.K.A Johnson, Antonio exit from the front passenger door of the black Oldsmobile. He advised tha[sic] all three suspects had guns *("E" having a large gun which bond describes as a bump).* Bond also stated that *he observed all three suspects firing their guns* in the direction of the Honda he was driving.

(SAF ¶53) (emphasis added).

Bond's alleged statements implicating Hill as the shooter of a shotgun was not contained in the signed statement he gave hours later to Reardon and Thomas. (SAF ¶54). Of the three victims, Bond was the most vulnerable to coercion and the least credible. He was a juvenile who had already been arrested nearly two dozen times and was a convicted felon on probation with an outstanding arrest warrant. (SAF ¶52). Bond was the only occupant of the Civic to sign a statement placing Hill at the scene. For his "cooperation," Bond was never charged for the ammunition, driving a stolen vehicle, resisting arrest or possession of marijuana. (SAF ¶55). ASA Reardon was coy about discussing a deal with Bond, conceding only that the charges against Bond "may have" come up during the interview resulting in the statement which he drafted for Bond's signature. (SAF ¶55). Reardon admitted that a statement obtained through threats and/or promises would be "untrustworthy." (SAF ¶56).

### G. The Photographic Lineup

Bond, McReynolds and Thornton viewed photographic lineup forms and circled Hill's picture. (SAF ¶56). Banks administered the McReynolds lineup; allegedly, McReynolds circled Hill's picture and wrote: "I saw him and the car shooting at me." McReynolds, however, testified to the Grand Jury that (1) "he told me to pick out E," and (2) Hill "was not on the scene." Banks

admitted that McReynolds ***did not*** tell him that he saw Hill shoot at him. Neither Bond, Thornton or McReynolds told Banks that Hill was at the scene shooting at them, or he would have written it in a report. No such report(s) exists. (SAF ¶58). McReynolds' alleged statement about Hill "shooting at" him was also contradicted by the signed statement prepared by Reardon just hours later, which makes no mention of seeing Hill at the scene, let alone firing a weapon. (SAF ¶59).

During his grand jury testimony, McReynolds admitted that he ***did not*** see Hill in the car, and, worse, he was specifically instructed to implicate Hill during the photo lineup that Banks administered:

Q:    Did anyone tell you who to pick out of the line up
A:    You want me to tell it like, yeah, yeah, ***he told me to pick out E [Hill],*** because I didn't know E that well. ***He told me to pick out E.*** I knew who Shady and Chicky was. I already knew who they was.
                    \*      \*      \*      \*
Q:    I am going to ask you to sign your name there on the bottom indicating ***that you identified the person in the photograph as E, but he was not on scene or that you didn't see him as being the third person that shot at you that day. Is that correct?***
A:    ***Yes.***

(SAF ¶60). That grand jury did not indict Hill.

**H.    CCSAO And Thomas Falsely Claim That
        A McDonald's Surveillance Video Implicates Hill**

Thomas unsuccessfully attempted to get an arrest warrant for Hill on March 12. A second attempt on March 17 was also denied. (SAF ¶38). At Reardon's suggestion, the HPD requested that the McDonald's share its surveillance video from the morning of March 12. The CCSAO Fact Sheet indicates that the McDonald's video would "corroborate V's initial accounts of Hill being with the shooters, and put him with the group in the offending vehicle immediately after the shooting." (SAF ¶39).

Thomas received the McDonald's video on March 20 and provided it to the CCSAO, whose "Fact Sheet" explicitly indicated that ASA Murillo (1) obtained the McDonald's surveillance video

and (2) described it as showing Hill with the two shooters minutes after the shooting:

> 3/20/14    Criminal
> ***Asa Murillo obtained copy of DVD (from McDonalds) which shows Co-D (Ezra Hill)***
> ***w/other codefendants ordering food at McDonalds moments after the shooting,***
> ***corroborating the fact that he was present.***  Offers made numerous attempts to
> locate     Co-D at his home on March 13, 14, and 15.  Det. Spoke w/neighbors, but
> have no    information of Ds whereabouts.  ***Arrest Warrant approved for D (Ezra) on***
> ***3/20/14 at 955am.***

Murillo then approved the arrest warrant for Hill.  (SAF ¶40) (emphasis added).

Thomas claims that he informed the CCSAO that he identified Hill in the McDonald's video on March 20, 2014.  (SAF ¶42).  Murillo reviewed the McDonald's video with his attorneys prior to his deposition but was unable to identify Hill during that meeting, or while viewing the video at his deposition. (SAF ¶41).  After Murillo's deposition, Plaintiff served interrogatories requesting Murillo to specifically state where in the video Hill allegedly appears, interrogatories which he declined to answer.  After Magistrate Judge Cummings granted Plaintiff's Motion to Compel, Murillo and Thomas served nearly identical interrogatory answers on this issue.  Thomas claims that Hill can be seen in the "camera view at windows media player time mark 49:15," along with White and Johnson.  Murillo identified the same figure in video as Hill.  Per the video's timestamp, Thomas and Murillo "identified" Hill at the McDonald's counter at 11:14 a.m.  (SAF ¶43).

Thomas and Murillo's litigation-inspired "identification" of Hill (and White and Johnson) in the video is demonstrably false for several reasons.  ***First***, there were ***four*** - not three - individuals in that portion of the video.  (SAF ¶44).  ***Second***, the figure in the video that is purportedly Hill is the same height - if not taller - than the individual that is purportedly Johnson, even though the six-foot Johnson is five inches taller than Hill. (*Id.*).  ***Third,*** Hill could not have been in the video with White and Johnson because they had already been arrested by the 11:14 a.m. timestamp on Murillo and Thomas' alleged identification. Johnson's Mugshot Report

indicates that he was arrested at "11:15." Thomas also confirmed that the Oldsmobile was parked in the driveway at 14610 S. Des Plaines when they arrived at "10:45 to 11:00" (SAF ¶44). Defendants knew that the video did not show Hill, and they essentially buried it after March 20, 2014. It was never used at Hill's criminal trial; indeed, it was never produced to his defense attorney. (SAF ¶45).

## I. Thomas' False Grand Jury Testimony

On September 16, 2014, Thomas testified that Hill pointed a firearm and shot at the victims, false testimony which resulted in a true bill indictment against Hill. (SAF ¶63). Thomas knew this testimony to be false, as (1) he had participated in threatening White into signing a false statement stating that Hill had fired the Benelli shotgun four times, and (2) the physical evidence confirmed that the shotgun had not been fired. For good measure, Thomas also falsely testified that "Hill's FOID card was revoked at the time" of the shooting; it was **Thomas** who later submitted the request to revoke Hill's FOID card on March 12. (SAF ¶63).

## III. ARGUMENT

### A. Hill Has a *Fourth Amendment* Claim Under 42 U.S.C. § 1983 Because Defendants Put Him in Jail for 30 Months Without Probable Cause

Defendants do not directly address Hill's *Fourth Amendment* claim under *Manuel v. City of Joliet*, 137 S.Ct. 911, 918-19 (2017), 903 F.3d 667, 670 (7th Cir. 2018), which Hill described in his response to their motion to dismiss. (Dkt. 43 at 3). Under *Manuel*, Hill has a *Fourth Amendment* claim for his pretrial detention without probable cause for the period *after* legal process began. *Lewis v. City of Chicago*, 914 F.3d 472, 476-77 (7th Cir. 2019) (describing *Manuel* claim). *Manuel* superseded Seventh Circuit precedent that addressed such pretrial detentions under due-process law. *Id.* at 476. However, it has long been established "that falsifying the factual basis for a judicial probable-cause determination violates the *Fourth Amendment*." *Id.* at 477.

Here, because of Defendants, in September 2014 a judge ordered Hill to jail and a grand jury indicted him. There was no actual probable cause; those determinations were tainted by the miscarriage of justice orchestrated by all the Defendants in this action. Any Defendant who provided a false basis for the probable-cause determination is liable for violating the *Fourth Amendment*. *Id.* Defendant Thomas is clearly on the hook. He repeatedly presented his "evidence" against Hill to the junior Assistant State's Attorneys, Reardon and Murillo, tasked with vetting probable cause for the crime of attempted murder. Thomas was turned down twice for an arrest warrant based on unreliable witnesses, but he succeeded the third time only after a bogus identification of Hill in the McDonald's video. (SAF ¶¶38-40). Thomas personally signed the Hill felony complaint and was the only source of evidence to the subsequent Hill grand jury. (SAF ¶¶62-63). Banks also is liable as a direct participant with Thomas in the "investigation" that falsely targeted Hill for prosecution. (SAF ¶¶14-23 (initial arrests), 29-30 (White interview), 35-36 (shotgun), 57-61 (photo array)). A jury also could find that Banks, who was Thomas' boss, should have intervened to stop the charges, or that Banks and Thomas agreed to proceed against Hill. *Hurt v. Wise*, 880 F.3d at 842-843 (denying summary judgment on failure-to-intervene and conspiracy claims relating to detentions without probable cause).

A *Manuel* claim depends on the absence of probable cause, but subjective "malice" is not required. *Manuel*, 903 F.3d at 670 ("this is a plain-vanilla *Fourth Amendment* claim, and analysis under that provision is objective"). Defendants raise a probable cause defense and argue qualified immunity if they were "mistaken" about probable cause. (Harvey Mem. at 11-13, 15). The jury here must decide probable cause, which is based on facts the Defendants knew or recklessly disregarded as of September 2014 when they put Hill in jail. *Lewis*, 914 F.3d at 477; *Juriss v. McGowan*, 957 F.2d 345, 351 (7th Cir. 1992). First, a jury can find that Defendants did not have probable cause for attempted murder in September 2014. Second, "a jury could reasonably

conclude it was objectively unreasonable for an officer to have believed there was probable cause." *Hurt*, 880 F.3d at 842 (denying summary judgment); *Williams v. City of Chi.*, No. 17 C 5186, 2020 U.S. Dist. LEXIS 42875, *19-21 (N.D. Ill. Mar. 12, 2020) (denying summary judgment). The Court cannot decide probable cause because "there is room for difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (probable cause is jury question). *See also Tolan v. Cotton*, 572 U.S. 650, 134 S.Ct. 1861, 1866-68 (2014) (reversing qualified immunity summary judgment; noting importance of drawing inferences for the non-movant and not weighing evidence).

Defendants also claim that Hill's indictment exonerates them because a grand jury determined probable cause. (Harvey Mem. at 12). The indictment at most is a rebuttable, *prima-facie* showing of probable cause. *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019) ("presumption may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means."); *Lewis*, 914 F.3d at 477 (presumptive validity of judicial determination of probable cause is overcome by evidence that officer procured it with false statements); *Williams v. City of Chicago*, 2018 U.S. Dist. LEXIS 92515, *13 (N.D. Ill. June 1, 2018) (officer influence on or misstatements to prosecutor prevents indictment from breaking chain of causation). Defendants ignore the decisive fact that Thomas was the only witness before the September 2014 grand jury that indicted Hill. Thomas personally procured the attempted-murder indictment with his story that Hill shot at the victims. (SAF ¶¶62-63). Defendants try to conflate different grand juries to falsely suggest that Hill's grand jury heard testimony from "the three victims." (Harvey Mem. at 12). In fact, Thornton (SAF ¶50), Bond (SAF ¶56), and McReynolds (SAF ¶¶59, 61) testified in different proceedings in March and April. Those grand juries did *not* indict Hill.

Defendants' core argument is that "the witness statements coupled with the physical evidence" are probable cause as a matter of law. (Harvey Mem. at 13). They identify no physical evidence against Hill, except to say that Hill's car was used by the offenders White and Johnson. (*Id.*). However, Thomas and Banks personally found White and Johnson, not Hill, in that car right after the shooting. (SAF ¶¶20-21). Thus, Defendants are left to argue that witness statements are enough, citing cases on eyewitness identifications as probable cause. "[A] complaint of the putative victim or single witness is generally sufficient to establish probable cause, ***unless the officer has a reason to question the witness' account.***" *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (emphasis added). Defendants cite *Coleman*, where an innocent victim of a home invasion saw a man for three minutes, gave a description with no coaching, then consistently and repeatedly identified the plaintiff. 925 F.3d at 340-42, 351. Defendants also cite a case finding probable cause from four witnesses and no evidence of coaching. *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). Those cases are distinguished on the facts here. A jury can conclude that Defendants knew that none of their witnesses had ***reliably*** identified Hill as a third participant in the attempted murder. *Williams*, 2020 U.S. Dist. LEXIS 42875 at \*15-18; *Kuri v. Folino*, 2019 US Dist. LEXIS 151304, \*48-\*49 (N.D. Ill. Sept. 5, 2019).

"Reliability, not coercion, is the gravamen of probable cause." *Hurt*, 880 F.3d at 841. In *Hurt*, the arresting officers claimed "arguable probable cause" immunity from two confessions used against three plaintiffs. *Id.* The main confession was "replete with easily verified and contemporaneous evidence of inaccuracy and unreliability." *Id.* at 837. The other confession was no better. *Id.* at 837-38. The officers' claim that a store clerk identified the plaintiffs was disputed. *Id.* at 838. The plaintiffs had a *Manuel* claim because the officers' creation of false evidence gave rise to the inference that they were "aware that the continuing incarcerations were unsupported and could have done something to stop them." *Id.* at 843.

A jury can find the witnesses are not a reliable source of probable cause. Defendants were the only source of the false narrative that Hill fired the shotgun they found when they arrested White and Johnson. (SAF ¶3). *Kuri*, 2019 US Dist. LEXIS 151304 at *49 ("the fact that the Defendants told [two victims] whom to identify obviously destroys probable cause"). White did not provide probable cause because he *never* told Defendants that Hill was there. (SAF ¶29). Defendants eventually got White to sign a statement that Hill shot four times. (SAF ¶28). They had to know that was false and certainly knew it was unreliable. They had to know the shotgun never was fired. They also threatened White with prosecution as an adult and provided leniency for his statement against Hill. (SAF ¶¶30-32). *Hart*, 798 F.3d at 588 (witness identifications obtained by coaching, manipulation, or coercion are not probable cause). For McReynolds and Thornton, there is no signed statement or testimony identifying Hill as a shooter. (SAF ¶¶47, 49-50, 60-61). McReynolds specifically testified to a grand jury that Hill was not there. (SAF ¶61). Defendants only have Thomas' contradictory (and hearsay) interview reports claiming the witnesses identified Hill. A jury can decide that the witnesses never told Thomas what he wrote down. (SAF ¶¶46-50). That leaves Bond, the juvenile hardened criminal facing multiple charges. (SAF ¶¶51-52). Thomas also wrote a report claiming that Bond identified Hill as a shooter, a claim the jury can disregard. (SAF ¶53). The police and ASA Reardon got Bond to sign a statement with a different story, which only put Hill at the scene. (SAF ¶54). Bond was not charged with serious crimes in exchange for his signature, a circumstance that made the statement "untrustworthy" as ASA Reardon admitted. (SAF ¶¶55-56). Defendants' photo arrays are evidence of nothing beyond the witnesses' ability to circle a picture. (SAF ¶¶57-61). In sum, a jury can find that *no* witness reliably identified Hill as a participant. In fact, Thomas was unable to get a warrant issued for Hill on the strength of the witnesses. (SAF ¶38). Finally, in March 2014, Defendants used the McDonald's video to justify probable cause for arrest (SAF ¶¶39-42), but the claim that Hill is in

the video is so specious (SAF ¶¶44-45) they do not even defend it now.

This is not a case where police arrived at the scene of the crime and made an arrest based on allegations by eyewitnesses. That type of arrest scenario is the source of the principle that "[p]olice need not conduct an investigation but may arrest and let prosecutors and courts determine who is telling the truth." *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006). "[P]olice on the scene must act yet lack the tools to determine immediately where the truth lies." *Id.* at 896. *See also Norris v. Ferro*, 2009 U.S. Dist. LEXIS 32722, *13 (N.D. Ill. 2009) (citing *Askew*) (rejecting officer's testimony and denying summary judgment on probable cause). Here, Defendants put Hill in jail in September 2014 on a charge of attempted murder, *after* they had a completed investigation. The paucity of any evidence, including from witnesses, gave them every reason to doubt their own contrived narrative of Hill as shooter. *Williams*, 2020 U.S. Dist. LEXIS 42875 at *15-18 (denying summary judgment where a jury could conclude statements of victim and co-defendant were not reliable probable cause); *Kuri*, 2019 US Dist. LEXIS 151304 at *20-21, *49 (denying post-trial motions where officers told victims to identify plaintiff); *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) (fabricated or tainted evidence cannot support a finding of probable cause); *Lewis*, 914 F.3d at 477 ("falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment"). A jury can find that Defendants lacked actual or arguable probable cause for the charge of attempted murder that kept Hill in jail for 30 months.

**B.   Due Process Does Not Apply After *Lewis***

In the opinion denying Defendants' motions to dismiss, this Court held that Hill stated a due-process claim for a pretrial deprivation of liberty, under Seventh Circuit cases including *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Dkt. 50 at 7-8. While the disputed facts here support a *Whitlock* claim, the Seventh Circuit in *Lewis* has since held "that a §1983

claim for unlawful pretrial detention rests *exclusively* on the *Fourth Amendment*." 914 F.3d at 478. *Lewis* expressly overruled contrary precedent and held that the *Due Process Clause* does not apply without a conviction. *Id.* at 479-80. Therefore, Hill's Section 1983 is grounded in the *Fourth Amendment* and *Manuel* as addressed above. The Court need not address due-process law.

### C.     Hill Has a Claim for Malicious Prosecution Under Illinois Law

Malicious prosecution is a tort under Illinois law. The same facts supporting the federal *Manuel* claim allow a jury to find the elements discussed at pages 11-14 of Defendants' brief. Defendants commenced the criminal prosecution, and it terminated when Hill was acquitted. Defendants acted without probable cause as discussed above. *See Coleman*, 925 F.3d at 350-51 (applying same probable cause standard to federal and state claims). A jury also can find the improper motive required for the "malice" element. (Harvey Mem. at 14). A jury can agree with Hill that the prosecution was a contrived effort to get him. (SAF ¶3). Even after it failed, Thomas said: "We didn't get your boy [Hill], but we're going to get him on something." (SAF ¶4).

### D.     Defendants' Other Arguments Are Not a Basis for Summary Judgment

Defendants attack the "conspiracy claim" (Harvey Mem. at 9), but conspiracy is not a separate claim; it is a legal theory making each defendant liable for the other's actions as conspirators. As already addressed in the discussion of the *Manuel* claim, a conspiracy theory of joint liability is supported. A jury can find that Thomas and Banks (with or without the ASA Defendants) worked together and agreed to prosecute Hill knowing they lacked probable cause. Circumstantial evidence of that agreement is sufficient. *Hurt*, 880 F.3d at 842-43.

Defendants argue that the City of Harvey has no direct liability for the federal claim under the *Monell* doctrine. (Harvey Mem. at 10). However, Defendant Banks was a Deputy Chief of the Harvey Police Department. His actions were the official policy of the department. Harvey also is

a proper defendant because it has statutory liability for compensatory damages awarded against Thomas or Banks and *respondent superior* liability for Illinois-law malicious prosecution.

Defendants argue Illinois statutory immunity for malicious prosecution, citing 745 ILCS 10/2-202. A jury could find "willful and wanton" conduct as defined by 745 ILCS 10/1-210 for the same reasons as the "malice" element of malicious prosecution. Defendants' only immunity argument is that they had probable cause (Harvey Mem. 14), but a jury could find no probable cause as shown above.

Defendants' arguments for qualified immunity under federal law (Harvey Mem. at 15), were addressed above in the discussion of the *Manuel* claim. First, Defendants violated a clearly established right. They procured Hill's pretrial detention without probable cause in violation of the *Fourth Amendment*. That right was clearly established by 1978, decades before September 2014. *Lewis*, 914 F.3d at 477. "It has been clear since at least *Franks v. Delaware*, 438 U.S. 154 (1978) that falsifying the factual basis for a judicial probable-cause determination violates the *Fourth Amendment*." *Id.* Second, Defendants do not have qualified immunity based on reasonable but mistaken probable cause, sometimes called "arguable probable cause." *Williams*, 2020 U.S. Dist. LEXIS 42875 at *19-21 (denying summary judgment). *Hurt* also denied summary judgment on qualified immunity where the evidence included the plaintiffs' own confessions. 880 F.3d at 842. Viewing the evidence in Hill's favor, "a jury could reasonably conclude it was objectively unreasonable for an officer to have believed there was probable cause." *Id.* The unreliable witness statements, the absurd McDonald's video, and the lack of any physical evidence amply support that finding.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion should be denied.

Dated: June 23, 2020

Respectfully submitted,

/s/ Paul K. Vickrey
Paul K. Vickrey
Patrick F. Solon
Gretchen K. Schmidt
Dylan M. Brown
Vitale, Vickrey, Niro Solon & Gasey LLP
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
schmidt@vvnlaw.com
dbrown@vvnlaw.com
*Attorneys for Plaintiff*