**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Ezra Hill, | |
| Plaintiff, | No. 17 CV 04699 |
| v. | Honorable Nancy L. Maldonado |
| City of Harvey, Gregory Thomas, and Deputy Police Chief Banks, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ezra Hill filed this lawsuit against Defendants Gregory Thomas and Jason Banks (the "Defendant Officers"), and the City of Harvey, Illinois (collectively "Defendants"), asserting claims for unlawful pretrial detention in violation of the Fourth Amendment, and malicious prosecution in violation of Illinois law. After a six-day trial, a jury returned a verdict in favor of Hill with respect to his unlawful pretrial detention claims against the Defendant Officers, and his malicious prosecution claims against Thomas and the City of Harvey. The jury returned a verdict in favor of Banks with respect to Hill's malicious prosecution claim. The jury awarded Hill compensatory damages in the amount of $3,000,000.00 and punitive damages against Thomas in the amount of $2,500.00.

Pending now are Defendants' motion for judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50(b), and their motion for a new trial under Rule 59(a), or alternatively, for remittitur of the damages award. (Dkts. 251, 252.)[1] For the reasons set forth in this Memorandum Opinion and Order, the Court denies both motions in full.

---

[1] In citations to the docket, page numbers are taken from the CM/ECF headers, except when the Court cites to deposition testimony or the trial transcript, in which case the Court cites to the internal transcript page and line number.

## Factual Background

The Court will summarize the relevant facts here as necessary background to resolve the pending motions.

Plaintiff Ezra Hill, who was 27 years old at the time of the relevant events, is a native of the City of Harvey, Illinois. Hill worked as a truck driver, and also previously worked as a booking officer for the Harvey Police Department ("HPD"). Defendant City of Harvey is a municipal corporation organized under the laws of the state of Illinois. Defendant Thomas was employed by the City of Harvey as a detective with the HPD. Defendant Banks was the Deputy Chief of HPD.

On September 4, 2014, Hill was arrested, detained, and subsequently prosecuted for the attempted murder of three individuals: Eric Bond, Alquan McReynolds, and Ahmad Thornton. The events leading to Hill's arrest and subsequent prosecution are as follows: On March 12, 2014, at approximately 10:31 a.m., Bond was driving a stolen red Honda Civic through Harvey with McReynolds and Thornton as passengers when another vehicle, a black Oldsmobile Intrigue owned by Hill, drove up behind the Civic. Multiple occupants exited the Oldsmobile and shot at Bond, McReynolds and Thornton, hitting the car but not injuring any of the occupants. Bond drove off and crashed the Civic one block away, and he, McReynolds, and Thornton were subsequently apprehended by the HPD when officers arrived on the scene shortly after.

After the shooting, the black Oldsmobile drove away to a nearby McDonalds. It is undisputed that at least two individuals were in the Oldsmobile at the time of the shooting: Antonio "Shady" Johnson and Andrew "Chicky" White. White, who was fifteen years old at the time, had a pre-existing dispute with Bond and the other occupants of the Civic which had led to the shooting. The key factual dispute giving rise to Hill's arrest and subsequent prosecution, and the instant civil rights case, was whether Hill was also in the Oldsmobile with White and Johnson at the time of

the shooting, or at the least whether it was reasonable for the Defendant Officers to believe he was in arresting him. In short, while Defendants argued that Hill was present and participated in the shooting, Hill contends he was not present and merely loaned his car to White that day with no knowledge of what he intended to do.

The Defendant Officers were among the HPD officers who responded to the calls about the shooting. While at the scene, they were provided a description of the black Oldsmobile and learned that one of the victims—apparently Bond—had identified White as one of the shooters. Banks was familiar with White from previous interactions, and together with Thomas proceeded to White's home address around 11:00 a.m. the same day. The Defendant Officers found White and Johnson sitting in the Oldsmobile, which the Defendant Officers identified as owned by Hill, and proceeded to arrest the two men and search the car. During the search, the Defendant Officers found a revolver, a pistol, and a Benelli M4 semi-automatic shotgun ("the shotgun") in the trunk. The shotgun was fully loaded with six live rounds. The officers also recovered a black jacket.

White and Johnson were subsequently taken to the Harvey police station, where Bond, McReynolds and Thornton were also being held. The Defendant Officers, with the assistance of Cook County Assistant State's Attorney ("ASA") Liam Reardon, proceeded to question and take statements from all the individuals involved. Hill and Defendants present starkly different narratives as to what occurred during the course of these interrogations, which lasted over 12 hours throughout the remainder of the day on March 12, 2014, and into the early morning hours of March 13, 2014. To summarize, Defendants maintain that several of the individuals, including White and Bond, voluntarily signed statements that placed Hill at the scene as one of the shooters. Hill, on the other hand, claims that the Defendant Officers concocted a scheme to illicit false identifications from the witnesses in order to implicate Hill. As will be discussed in further detail below, White

3

would later testify at his deposition in this case that Hill was not in fact present at the shooting, and that White had fabricated his identification of Hill in his initial statement at the express instruction of the Defendant Officers and Reardon in exchange for preferable treatment. (*See, e.g.*, Dkt. 245, Trial Tr. at 614:8–10, 622:23–623:10.)

In any event, after the interrogations the Defendant Officers subsequently sought an arrest warrant for Hill on the basis of the signed White and Bond witness statements, but the Cook County State's Attorney's Office initially denied the request for a warrant. The HPD then secured surveillance footage from the McDonalds where the Oldsmobile had traveled after the shooting. After reviewing the footage, Thomas provided the video to ASA Ed Murillo, and told Murillo that Hill was in the footage. Murillo then reviewed the McDonalds video himself, and on March 20, 2014, approved an arrest warrant to charge Hill with attempted murder.

Hill was eventually arrested on September 4, 2014, in Dyer, Indiana and subsequently extradited to Illinois. On September 16, 2014, a grand jury indicted Hill on attempted murder charges, and he spent the next 31 months in pre-trial detention at the Cook County Jail. Finally, on March 8, 2017, Hill was tried for attempted murder and was acquitted. Hill's trial lasted one day, and the jury returned a verdict after deliberating for just 30 minutes.

**Procedural History**

Based on the above events, Hill initiated this civil rights lawsuit in June 2017. Hill filed an amended complaint in June 2019 asserting claims against the Defendant Officers for unlawful pretrial detention in violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983, conspiracy to deprive constitutional rights under § 1983, and malicious prosecution and civil conspiracy under Illinois law. Hill also asserted claims against the City of Harvey under a theory of respondeat superior liability and state law indemnification, as well as a municipal liability claim

4

under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). (*See generally* Dkt. 115, Am. Compl.)

After the close of discovery, the Court denied a motion for summary judgment brought by Defendants on September 29, 2020. (Dkt. 172.)[2] After a series of delays from further motion practice through the fall of 2021, this district's limited trial schedule due to the COVID-19 pandemic in 2021 and throughout most of 2022, and the reassignment of the case to the undersigned in October 2022, the case ultimately proceeded to a jury trial on Hill's claims for unlawful detention and malicious prosecution on June 23, 2023.

At the conclusion of Hill's case, Defendants filed a motion for judgment as a matter of law, i.e., for a directed verdict under Rule 50(a). (Dkt. 235.) During oral argument on the motion, Hill indicated that he was abandoning his claim against the City of Harvey for *Monell* liability. The *Monell* claim as a basis for liability against the City of Harvey was therefore dismissed, but the Court otherwise denied Defendants' motion for a directed verdict. (Dkt. 237.) On June 30, 2023, the jury returned a verdict in favor of Hill and against the Defendant Officers on Hill's claims for unlawful pretrial detention. As to Hill's claim for malicious prosecution, the jury returned a verdict in favor of Hill and against Defendants Thomas and City of Harvey, but returned a verdict in favor of Banks. The jury awarded compensatory damages in the amount of $3,000,000.00, and punitive damages against Thomas in the amount of $2,500.00. (Dkt. 241.)

Pending now are Defendants' post-judgment motions, including a motion for judgment as a matter of law under Rule 50(b), in other words for judgment notwithstanding the verdict, and a motion for a new trial under Rule 59. Defendants' motion for a new trial also seeks as an alternative

---

[2] Hill's amended complaint also named Cook County and ASA's Reardon and Murrillo as defendants. The Court dismissed Murrillo on summary judgment, but denied Reardon's and Cook County's motion for summary judgment. Hill later filed a voluntary stipulation to dismiss Reardon and Cook County as defendants. (Dkt. 195.)

remittitur of the jury damages award.

## Legal Standards

A motion under Rule 50(b) is essentially a post-verdict renewal of a Rule 50(a) motion for a directed verdict, and asks the court to enter judgment as a matter of law against a party that prevailed at trial. *See* Fed. R. Civ. P. 50(a)(1), (b). The Court should only grant a Rule 50(b) motion if "a reasonable jury would not have a legally sufficient evidentiary basis to find" for the prevailing party. *See id.* "In other words, a trial court should overturn a verdict only where the evidence supports but one conclusion—the conclusion not drawn by the jury." *Ryl-Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009). In reviewing such a motion, courts construe the evidence "strictly in favor of the party that prevailed at trial," including by "drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2012) (citations omitted).

In the alternative to judgment notwithstanding the verdict, the moving party may request a new trial under Rule 59(a). Fed. R. Civ. P. 50(b); *see* Fed. R. Civ. P. 59(a). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014); *see also Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) ("A new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'") (citation omitted). "When considering whether the jury's verdict goes against the manifest weight of the evidence, a court analyzes the 'general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial.'" *Willis v. Lepine*, 687 F.3d

826, 836 (7th Cir. 2012) (citation omitted). Rule 59(e) additionally provides that a court may alter or amend a judgment where there is evidence of manifest error of law or fact. Fed. R. Civ. P. 59(e).

## Discussion

### I. Defendants' Rule 50(b) Motion for Judgment as a Matter of Law

The Court begins with Defendants' Rule 50(b) motion for judgment as a matter of law. Defendants argue that there was no legally sufficient basis for a reasonable jury to find for Hill on his claims for unlawful detention in violation of the Fourth Amendment and for malicious prosecution under Illinois law, and that the verdict must therefore be vacated, and judgment entered in Defendants' favor. (Dkt. 251.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A person is 'seized' whenever an official 'restrains his freedom of movement' such that he is 'not free to leave.'" *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019) (quoting *Brendlin v. California*, 551 U.S. 249, 254–55 (2007)). "The general rule is that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Id.* (quoting *Bailed v. United States*, 568 U.S. 186, 192 (2013)) (internal alterations omitted). A pretrial detention is a "seizure" within the meaning of the Fourth Amendment and is therefore "justified only on probable cause." *Id.* (citations omitted). Thus, in order to prove his claim for unlawful detention in violation of the Fourth Amendment, Hill was required to prove that Defendants Thomas and Banks caused his pretrial detention and did so without probable cause. *See id.*; *see also, Bahena v. Kennedy*, 2021 WL 8153974, at *6 (N.D. Ill. Oct. 25, 2021) (describing

elements for unlawful pretrial detention claim) (collecting cases).[3]

Malicious prosecution is a common law claim under Illinois state law. To prove his claim for malicious prosecution, Hill was required to establish: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant[s]; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Lund v. City of Rockford, Illinois*, 956 F.3d 938, 949 (7th Cir. 2020) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)).

Defendants' primary overarching argument in favor of setting aside the jury's verdict is that Thomas and Banks had probable cause to arrest Hill as a matter of law. Defendants additionally argue that they are entitled to qualified immunity, that they are entitled to judgment on any claim for conspiracy, and that there was no sufficient basis for the jury to award punitive damages. The Court will address each of Defendants' arguments below.

### A. The jury had a legally sufficient basis to find that the Defendant Officers lacked probable cause for Hill's arrest and detention.

The existence of probable cause to arrest is an absolute bar to any claims for unlawful detention under the Fourth Amendment and malicious prosecution under Illinois law. *See Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 682 (7th Cir. 2007). "Police officers have probable cause to arrest when the totality of the facts and circumstances within their knowledge at the time of the arrest would warrant a reasonable person in believing the person has committed a crime." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015); *see also Idris v. Conway*, No. 12 C 6271, 2014 WL 4244222, at *6 (N.D. Ill. Aug. 27, 2014) ("The test is an objective one and evaluates whether probable cause existed on the facts as they

---

[3] An unlawful pretrial detention claim also generally requires the plaintiff to establish that the criminal proceedings against him terminated in his favor. *See Bahena*, 2021 WL 8153974, at *6. This element is not at issue in this case, as it is undisputed that Hill was acquitted by the state trial court.

appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect.") (citation omitted). In assessing whether the jury's probable cause finding was supported by legally sufficient evidence, it is important to reiterate that the Court must strictly construe all evidence in Hill's favor. *See May*, 716 F.3d at 971.

Defendants point to the following evidence introduced at trial as establishing probable cause that Hill had taken part in the shooting and committed the crime of attempted murder: it was Hill's vehicle used in the shooting; Thornton and McReynolds told officers there were three individuals in Hill's vehicle at the time of the shooting; police recovered five guns from Hill's vehicle, including a shotgun, shortly after the shooting; police recovered a black jacket from Hill's vehicle that tested positive for gunshot reside; Johnson told officers the jacket did not belong to him or White; and both Bond and White identified Hill as having been involved in the shooting. (Dkt. 251 at 4–5.)

Defendants place particular emphasis on White's signed statement that Hill was a fellow shooter, which he gave to Thomas and ASA Reardon. Defendants acknowledge that White later recanted his signed statement in his deposition in this lawsuit, instead claiming that Thomas and ASA Reardon had pressured him into identifying Hill as a shooter and signing the statement by threatening that White would be charged as an adult. (*Id.* at 5.) But Defendants argue that the evidence nonetheless shows that White gave his initial statement voluntarily, in the presence of his mother, Elizabeth Kellogg, and that he was not coerced or threatened. (*Id.* at 5.) Defendants further note that White affirmed his statement at his later plea hearing, and that it was not until his deposition in this lawsuit some five years later that he recanted. (*Id.*) Defendants separately point out that Bond, who also gave a statement, has never recanted his identification of Hill. (*Id.* at 8.) Defendants claim that the Bond and White statements, which the Defendant Officers had no reason

to believe were false at the time they were made, along with the other evidence discussed above, provided sufficient probable cause to arrest and detain Hill. (*Id.* at 8–10.)

The Court disagrees with Defendants' assessment of the sufficiency of evidence. Based on the Court's consideration of the trial record, the parties' arguments, and the applicable caselaw, the Court concludes that the jury had a legally sufficient evidentiary basis to find that Defendants Thomas and Banks lacked probable cause to believe Hill had committed a crime.

Starting with the White statement, Defendants attempt to downplay White's 2019 deposition testimony—in which he recanted his prior identification of Hill—by arguing that there was "no evidence" that White's original statement to Defendant Thomas in March 2014 was fabricated, or at least no evidence that the Defendant Officers knew or should have known the statement was false. (Dkt. 251 at 6.) But this argument misconstrues White's 2019 deposition testimony, which was read into the record at trial. White testified that he explicitly told Thomas that Hill was not involved in the shooting, and that it was Thomas and ASA Reardon who continually told White that Hill was involved and pressured him into identifying Hill under threats of being charged as an adult (White was 15 years old at the time). (*See* Dkt. 245, Trial Tr. at 621–627.) Thus, Defendants are simply wrong that there was "no evidence" that White's statement was fabricated or that Defendants should have recognized it as such; White testified that he fabricated the identification at Thomas's express direction, which is obviously evidence that Thomas would have known the statement was not reliable.

When presented with White's signed statement to police, his conflicting later claim that his statements were induced and coerced by Thomas, and Defendant Thomas's own testimony rejecting the claim of fabrication and asserting that White's statement was voluntarily given, it was up to the jury as the finder of fact to decide what and who to believe. It should be noted that the

portions of White's deposition testimony that were read for the jury were agreed to by both sides prior to their introduction and included extensive questioning of White about the fact that his deposition testimony at the time contradicted his earlier signed statement, a statement which he affirmed at his plea hearing. (Dkt. 245 at 662–675.) The jury was thus presented with evidence on both sides of the issue and were free to draw their own conclusions about White's deposition testimony of fabrication and coercion. The jury's ultimate verdict in favor of Hill and finding of no probable cause indicates they believed White's later deposition testimony that his initial statement had been fabricated at the direction of police, and it is not this Court's role to second guess that determination. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020) (noting that, in reviewing the legal sufficiency of a jury verdict, it is not the court's role to "reweigh evidence, assess the credibility of any trial witness, or otherwise attempt to usurp the jury's role as factfinder."); *see also Kuri v. City of Chicago, Illinois*, 990 F.3d 573, 575 (7th Cir. 2021) ("[A] [court] cannot prefer one [witness] statement over the other and use it as the basis for removing the dispute from the jury.").

The *Kuri* case decided by the Seventh Circuit is instructive on this point of the jury's role in weighing competing evidence and testimony: there, the plaintiff brought a § 1983 case against several officers alleging unlawful detention after he was acquitted of murder charges after spending three years in jail. 990 F.3d at 574. The civil case centered around a similar dispute over allegedly fabricated witness identifications: the defendant officers claimed that two victims had identified Kuri as a shooter, while the victims claimed they made no such identification, and that the defendants had fabricated the story. *Id.* The jury returned a verdict for Kuri, and the district court denied the defendants' post-judgment motions. *Id.* The Seventh Circuit affirmed, observing that, regardless of any inconsistencies or contradictions in the victims' statements, the jury's

verdict in favor of Kuri meant that the court was required to take the evidence in the light most favorable to him, and "on that view the criminal charge against him was bogus, an invention of the investigating detectives." *Id.* The court specifically rejected the defendants' arguments that one of the victim's statements could still support probable cause, notwithstanding the jury verdict, because accepting the statement would require the court "to disagree with the jury, which heard [the victim] deny ever fingering Kuri . . . .[and] the jury had to decide which (if any) of [the victim's] statements to believe." *Id.* at 575. By returning a verdict in favor of Kuri, the jury had plainly believed the victim's statement in which he denied identifying Kuri, and the court could not upset that finding. *See id.*

Here, as in *Kuri*, it was up to the jury whether to believe White's initial statement to police identifying Hill as a shooter (and whether to accept Defendants' corresponding testimony and evidence that the statement was voluntary), or to believe White's later deposition testimony that the initial identification was a fabrication at the direction of Thomas and Readon. The jury's verdict in favor of Hill suggests they believed his later deposition testimony over the Defendants' testimony and evidence. For the Court to conclude now, as Defendants request, that White's initial statement still supports probable cause, the Court would be required to do what the Seventh Circuit expressly said in *Kuri* it cannot: disagree with the jury and prefer one witness statement over another. Put another way, Defendants' argument would not only require the Court to re-weigh the evidence introduced at trial but would also require the Court to completely reverse the burdens for post-trial motions and construe all evidence *in their favor*, while ignoring evidence in Hill's favor. This, of course, the Court cannot do. Instead, the Court must strictly construe the evidence in Hill's favor, and disregard evidence favorable to the Defendants that the jury was not required to believe. *See May*, 716 F.3d 971. In construing the evidence in Hill's favor as is required, the Court finds

12

that a reasonable jury could accept White's deposition testimony and disregard his written identification as fabricated at the direction of Thomas and Reardon. The Court cannot rely on the initial White statement as a basis for finding probable cause as a matter of law, because to do so would supplant the jury's role in weighing the competing evidence and testimony.

The Court further notes that the prohibition on reweighing the evidence or favoring one witness's testimony over another is true regardless of whether White's testimony was presented to the jury via deposition transcript or live. The Court permitted Hill to read White's sworn deposition testimony to the jury under Rule 32 based on a finding that he was unavailable for trial. *See* Fed. R. Civ. P. 32(a)(4). As will be discussed further below, Defendants argue in their Rule 59(a) motion that the Court's decision to allow the deposition testimony under Rule 32 was an error that severely prejudiced their case and justifies a new trial. But regardless of whether the decision was an error—which the Court concludes below it was not—the fact that White's testimony was presented via deposition instead of in person does not bear on whether the jury's verdict was supported by legally sufficient evidence. While the Court recognizes there is a strong preference for live testimony, the jury was permitted, and was expressly instructed, consistent with the Seventh Circuit pattern instructions, to give deposition testimony the same consideration they would give had the witness appeared and testified in court. Seventh Circuit Pattern Jury Instruction 1.05 (citing generally *Sandridge v. Salen Offshore Drilling Co.*, 764 F.2d 252, 259 (5th Cir. 1985) (noting that "[a] trial court may not properly instruct a jury that a written deposition is entitled to less weight than live testimony."); *In re Air Crash Disaster*, 635 F.2d 67, 73 (2nd Cir. 1980) (approving of instruction that deposition testimony "is entitled to the same consideration and is to be judged as to credibility and weighed and otherwise considered by you in the same way as if the witness has been actually present in court")); *see generally United States v. Foy*, 50 F.4th 616, 623

(7th Cir. 2022) ("Pattern instructions are presumed to accurately state the law."). In other words, once the testimony was admitted by deposition, the jury was permitted to consider it the same as live testimony, that is, they could believe it or not and accept it over the testimony of other witnesses, regardless of whether that other testimony was live or via deposition. The jury was thus free to believe White's deposition testimony over that of other evidence and in-person witnesses.

Turning to the remaining evidence that Defendants claim supported probable cause as a matter of law, the Court finds that Hill provided sufficient evidence of his own at trial to undermine Defendants' claims and create a factual dispute for the jury to resolve. With respect to Bond's statement, Hill provided evidence to undermine the reliability and credibility of Bond's identification, including that Bond also was a juvenile, was using an alias to avoid an outstanding warrant, and was himself under arrest for multiple charges. (*See* Dkt. 243 Trial Tr. at 45:10–12; 237–238.) Hill also provided evidence of inconsistencies between Bond's statements as recorded by Thomas in his interview report, and Bond's later signed statement. Specifically, Thomas claimed in his report that Bond identified Hill as a shooter, but Bond's later signed statement merely indicated that Hill was present, and did not indicate he was a shooter (*See id.* at 177:24–178:6.) And there were other inconsistencies in the record with respect to the evidence purportedly giving rise to probable cause. While Bond and White claimed in their statements that Hill had fired the shotgun recovered from Hill's car, the gun was recovered from the trunk, was fully loaded, and there was no indication it had been fired. (*Id.* at 119:9–120:21.) Hill was also not with White and Johnson when Thomas and Banks found them sitting in Hill's car shortly after the shooting. (*Id.* at 44:23–25.) Further, Thomas indicated in his interview reports that McReynolds and Thornton both placed Hill at the scene of the shooting, but neither of their signed statements mentioned Hill being present, and neither McReynolds nor Thornton placed Hill at the scene of the shooting during

14

their grand jury testimony. (*Id.* at 46:2–10, 161:7–16, 164:23–165:2.) And finally, the jury was shown the McDonald's video that purportedly showed Hill together with White and Johnson shortly after the shooting. Hill testified (and his counsel argued) that he was not in the video, and the video was not ultimately shown at Hill's criminal trial despite the fact it had been a purported basis for the probable cause to arrest him. (*See e.g.*, *id.* at 71:1–6.)

It is true, as Defendants repeatedly note, that statements from witnesses or victims, even a single credible statement, can be enough to support probable cause to arrest. *See Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("[W]e have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause."). But the key qualifier in this rule is that the victim or witness statements must be credible. As Hill notes in his response, and as the jury was instructed, if the circumstances would lead a reasonable officer to be suspicious of the reliability of the statements, the officer has a further duty to investigate. *See, e.g., Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir.2003); *see also McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) ("An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation."). On this record of evidence, including the evidence of unreliability of the White and Bond statements, White's recanting of his identification and claims of coercion, and the other inconsistencies in the record evidence discussed above, a reasonable jury could conclude that reasonable officers in Thomas and Banks' position had a duty to further investigate the shooting, and could not reasonably rely on the purported witness identifications to support probable cause.

In sum, the Court finds that the jury's determination that Thomas and Banks lacked probable cause to believe that Hill had committed a crime was supported by legally sufficient evidence. Again, the Court reiterates that it is not its role to overrule the jury's weighing of the

evidence, or to retroactively favor one witness's testimony over another, and the Court must construe all the evidence at trial strictly in Hill's favor. In viewing all the evidence in Hill's favor, a reasonable jury could believe his version of events and conclude that the Defendant Officers failed to conduct a reasonable investigation and acted to illicit false identifications to place Hill at the scene, meaning that Hill's arrest was not supported by probable cause. Defendants may, understandably, vigorously disagree with the jury's finding. But that disagreement does not provide grounds to reverse a verdict that was supported by legally sufficient evidence.

**B. Defendants' other arguments in support of their motion for judgment are without merit.**

Apart from their probable cause argument, Defendants raise a number of other grounds for judgment notwithstanding the verdict. Each of their arguments fails.

First, Defendants argue that, even if there was no probable cause to arrest Hill, the Defendant Officers are entitled to qualified immunity. Qualified immunity is a judicially-created doctrine that shields public officials performing discretionary functions from civil liability unless their conduct violates clearly established statutory or constitutional rights. *See generally Brunson v. City of Chicago*, No. 11 C 02011, 2013 WL 870521, at *2 (N.D. Ill. Mar. 7, 2013) (citations omitted). In the context of a Fourth Amendment unlawful arrest or detention claim, qualified immunity protects officers who have a reasonable, albeit mistaken belief that probable cause existed, a concept often referred to as "arguable probable cause." *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013) (internal citations omitted); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (explaining that qualified immunity shields officers from damages if a reasonable officer could have believed the arrest was lawful in light of clearly established law and the information the officers possessed) (citations omitted).

Defendants argue in cursory fashion that the Defendant Officers had at least "arguable

probable cause" to arrest Hill, and if they were mistaken as to the existence of probable cause, that mistake was reasonable. But Defendants' argument fails for essentially the same reasons as their arguments above: the Court cannot pick and choose which witness statements or evidence to believe in an attempt to overrule the jury. In order for the Court to find that Defendants had a reasonably mistaken belief as to the existence of probable cause, the Court would have to completely ignore White's testimony that he fabricated his identification at Thomas's express insistence, and instead simply accept that his original identification was credible. The Court would also have to ignore the other contrary evidence in the record, such as the inconsistencies in Bond's statement, the inconsistencies between Thomas's interview reports and the witness statements, and the contrary physical evidence such as the lack of evidence that the shotgun was ever fired. But as discussed above, the Court cannot embark on a selective weighing of the evidence, disregarding evidence favorable to Hill and accepting only evidence favorable to the Defendants. Rather, the Court must accept the jury's determination, and by returning a verdict for Hill, the jury already weighed the evidence and agreed with Hill's version of events—that the Defendant Officers used what they knew were unreliable and, in the case of White, expressly fabricated statements to arrest Hill. Construing the evidence in this manner, the Court cannot find that Thomas and Banks had a reasonably mistaken belief of probable cause as a matter of law.

Second, Defendants argue that they are entitled to judgment on Hill's conspiracy claims under § 1983 and Illinois law, because Hill presented no evidence of an agreement between Thomas and Banks to deprive Hill of his constitutional rights. (Dkt. 251 at 13.) Although Hill pled separate causes of action for conspiracy, those conspiracy claims were not ultimately presented to the jury as independent claims for relief. Rather the case went to the jury on two claims, one for unlawful detention and one for malicious prosecution, and the parties specifically agreed on the

proposed verdict form that listed only those two claims. Hill's counsel made no mention of conspiracy in either his opening or closing statements, suggesting in retrospect that Hill may have abandoned conspiracy as a basis for liability on the unlawful detention and malicious prosecution claims. While the Court instructed the jury on conspiracy, using instructions that were proposed and largely agreed to by the parties,[4] the jury was not required to find a conspiracy in order to return a verdict for Hill on either count for unlawful detention or for malicious prosecution, but could find Thomas and/or Banks liable based on their own individual actions.

The Court acknowledges that, based on the format of the verdict form, it is unclear whether the jury found the existence of any conspiracy, notwithstanding the fact that such a finding was not required. The fact that the jury returned a verdict against both Defendant Officers on the unlawful detention claim, but only returned a verdict against Thomas on the malicious prosecution claim, could suggest that the jury did not find any such conspiracy or agreement between the officers, and simply found that each Defendant Officer proximately caused Hill to be detained without probable cause, but that it was Thomas alone who proximately caused Hill to be maliciously prosecuted. As detailed above, *supra* at 3–4, both Defendant Officers were involved in the investigation, interrogations and witness questioning, but it was Thomas who specifically contacted ASA Murillo to secure a warrant, which would support the divergent verdicts on the two counts. On the other hand, it is at least possible that the jurors found a conspiracy with respect to the unlawful pretrial detention claim, and that conspiracy was the basis for the verdict against one of the Defendant Officers. In retrospect, it would have been more prudent to confirm with Hill prior to instructing the jury whether he still intended to argue for conspiracy as a basis of liability,

---

[4] Defendants objected to a portion of the jury instruction that stated that the jury could "infer the existence of a conspiracy through the combination of common sense and the evidence before you," but the Court overruled that objection. Defendants notably do not claim any error from that ruling, nor do they argue that the Court should not have instructed the jury on conspiracy. Again, the instruction was agreed to, with the exception of the forgoing phrase.

and if so, to have used a more detailed verdict form so that the jury could articulate their reasoning, and whether their verdict was based on a finding of individual liability or conspiracy.

But regardless of whether the Court should have taken a different approach here—and Defendants notably do not claim there was an error in the Court's instructions or verdict form on this issue—it does not provide grounds for reversing the jury verdict. As explained in the above section, there was legally sufficient evidence from which the jury could conclude that both Defendant Officers, based on their individual conduct, were liable for unlawful detention, and Thomas was liable for malicious prosecution. Defendants' contentions about the lack of evidence of an express agreement or conspiracy are therefore a non-sequitur, because no such evidence was required for liability against both Defendant Officers on the unlawful detention claim. In other words, the jury's verdict did not depend on a finding of conspiracy.

Even if, however, the jury based their verdict on the finding of a conspiracy, the Court nonetheless concludes there was sufficient evidence to support that finding. The jury heard evidence that both Defendant Officers were together at the initial scene, were together when White and Johnson were arrested in Hill's car, and both participated in the interrogations that ultimately led to the witness statements that were the primary evidence in support of arrest. A reasonable jury could infer from this evidence, and the Defendant Officer's joint participation in the investigation, that the Defendant Officers entered into an agreement to cause Hill's pretrial detention without probable cause. While no such finding was required for the verdict, it would nonetheless be supported.

Finally, Defendants argue in passing that the punitive damages award against Thomas is unsupported as a matter of law, because Hill presented no evidence that Thomas acted maliciously or with reckless or callous indifference to Hill's rights. (Dkt. 251 at 15.) But there was ample

evidence presented to the jury that, if believed, could support a finding that Thomas had such malicious intent or callous indifference to Hill's rights. White's testimony that Thomas coerced him into fabricating a false identification could support such a finding on its own, and that testimony was supported by other evidence of inconsistences between Thomas's police reports and the signed witness statements. From this evidence, a reasonable jury could conclude Thomas acted with the requisite malicious or reckless conduct justifying an award of punitive damages.

In sum, Defendants have failed to demonstrate that they are entitled to judgment as a matter of law, and their motion under Rule 50(b) is therefore denied.[5]

## II. Defendants' Rule 59 Motion for a New Trial and Remittitur

The Court turns next to Defendants' alternative motion under Rule 59 for a new trial or for remittitur of the jury's damages award. In support of a new trial, Defendants argue that the jury's verdict was against the manifest weight of the evidence, and that the Court made several evidentiary errors that prejudiced Defendants and resulted in an unfair trial. Defendants additionally argue that they are entitled to a new trial, or alternatively remittitur of the damages award, because the Court's instruction on the tax consequences of a damages award improperly swayed the jury to inflate the award beyond what was legally supported. The Court will address each issue in turn below.

### A. The jury's verdict was not against the manifest weight of the evidence.

The Court can quickly dispense with Defendants' argument that the jury verdict was against the manifest weight of the evidence, because this portion of Defendants' Rule 59(a) motion

---

[5] Defendants additionally argue that the verdict against the City of Harvey for malicious prosecution must be overturned for the same reasons as the verdicts against Thomas and Banks, that is, because they had probable cause or at least arguable probable cause giving rise to qualified immunity. Because the Court concludes the jury verdicts against the Defendant Officers were supported by legally sufficient evidence, including the malicious prosecution claim against Thomas, the verdict against the City of Harvey also necessarily stands.

simply incorporates and restates their same probable cause arguments made in support of their Rule 50(b) motion for judgment. (Dkt 252 at 2–4.) In other words, Defendants argue that the jury's verdict was against the manifest weight of the evidence because there was "overwhelming evidence" presented at trial demonstrating that the Defendant Officers had probable cause to believe that Hill had committed the crime of attempted murder, and that the jury's verdict went against this overwhelming evidence. (*Id.*) But the Court has already concluded above that there was legally sufficient evidence from which a reasonable jury could conclude that the Defendant Officers *did not* have probable cause to believe that Hill committed a crime. Given that the jury's verdict was reasonably based on legally sufficient evidence, it can hardly be said that the verdict "shocks the conscious" or "cries out to be overturned." *See Davis*, 445 F.3d at 979. In short, based on the evidence discussed at length above, the Court concludes that the jury verdict was not against the manifest weight of the evidence.

**B. The Court did not commit evidentiary errors resulting in an unfair trial.**

Defendants next argue that the Court erred in ruling on three key evidentiary disputes, and that those rulings resulted in an unfair trial to defendants. "A party seeking a new trial based on alleged errors in evidentiary rulings bears a heavy burden to show that the result reached was inconsistent with substantial justice." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687, 701 (N.D. Ill. 2020) (citations omitted). An evidentiary error only meets this standard if there is a significant chance that the ruling effected the outcome of the trial. *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012); *see also Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 942 (7th Cir. 2001) ("[E]ven if a judge's rulings are found to be erroneous, they may be deemed harmless if the record indicates that the end result of the trial would have remained unchanged.").

Defendants point to three purported errors in particular. First, Defendants claim it was an error for the Court to allow Hill to present White's testimony via deposition. Second, Defendants claim it was an error for the Court to exclude a signed statement given to the police by White's mother, Elizabeth Kellogg, as well as a photograph of her holding the statement. And third, Defendants argue it was an error for the Court to allow Hill to present certain evidence related to his state court criminal trial. As explained below, the Court is not convinced that any of its evidentiary rulings constitute grounds for a new trial.

### 1. White's Deposition Testimony

First, Defendants claim that the Court erred in allowing Hill to introduce the deposition testimony of White at trial under Rule 32. Under that rule, a party may use the deposition of a witness at trial under certain circumstances, including, as relevant here, if the Court finds that "the party offering the deposition could not procure the witness's attendance by subpoena." Fed. R. Civ. P. 32(a)(4)(D). The Seventh Circuit has stated that this rule includes an implicit obligation that a party "use reasonable diligence to secure the witness's presence" at trial before seeking to use their deposition testimony. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 307 (7th Cir. 2010). The district court has broad discretion to determine whether this obligation has been satisfied. *Id.*; *see also Griman v. Makousky*, 76 F.3d 151, 154 (7th Cir. 1996) ("it is up to the district judge, within broad limits, to decide whether, in the circumstances, this condition [of reasonable diligence] has been satisfied.").

In order to address this dispute, some additional background is necessary. At the initial pretrial conference on June 8, 2023, Hill's counsel reported that they were having difficulty in locating White to serve him with a subpoena compelling his appearance at trial. Hill's counsel stated that they might seek to introduce White's testimony via his deposition taken in discovery if

they could not locate him, and that they had served their proposed designations of the portions of White's transcript they intended to use that same morning on Defense counsel. At the time of the continued pretrial conference on June 20, 2023, White still had not been served with a subpoena, and the parties indicated they were in the process of conferring on designating portions of White's deposition testimony to be introduced at trial. In other words, as of June 20, 2023, just three days before trial was set to begin, the parties appeared to agree that White was unavailable, and it was appropriate to introduce his testimony via deposition.

Then on the first day of trial on Friday June 23, 2023, after the conclusion of jury selection, Defense counsel indicated for the first time that they were contesting the issue of White's unavailability. While Hill's counsel indicated that their process server had been unable to locate an accurate address for White through skip traces, Defense counsel indicated that their process server had encountered White at his mother Kellogg's residence while serving her with a trial subpoena that past Wednesday (June 21, 2023). Defense counsel thus maintained that White was not unavailable for trial, but rather Hill's counsel had simply not undertaken reasonable efforts to serve him and secure his appearance. Based on the information provided by the parties, the Court directed Defense counsel to share Kellogg's address with Hill's counsel and for Hill's counsel to attempt to serve White at his mother's address with the subpoena, after which the Court would revisit the issue of whether he was truly unavailable for trial. Hill's counsel subsequently served White with a subpoena the next day, Saturday, June 24, 2023, compelling him to appear and testify on the following Tuesday, June 27, 2023.

Defendants proceeded to file a motion on June 26, 2023, seeking to bar White's testimony being introduced via his deposition. (Dkt. 228.) Defendants argued that Hill's counsel had not exercised reasonable diligence in trying to secure White's appearance, and that White's in-person

appearance was necessary so that the jury could assess the credibility of his testimony. (*Id.*) White ultimately did not appear for trial on June 27, 2023, and the Court heard oral argument on Defendants' objection later that day on the issue of whether White's testimony should be presented via deposition. After considering the parties' positions and case authority, the Court overruled Defendants' objection and allowed Hill to introduce White's testimony via his deposition. (Dkt. 233.) While the Court acknowledged that Hill's counsel could have been more diligent by starting the process earlier, the Court ultimately concluded that the requirements of Fed. R. Civ. P. 32(a)(4)(D) were satisfied because Hill could not procure White's attendance by subpoena despite their efforts to do so. (*Id.*) The Court noted in particular that White had been served with a subpoena but did not appear willing to voluntarily appear and testify, and that it would be a waste of resources to order the U.S. Marshals to arrest White and bring him in for testimony (which he may still refuse to give), when there was the alternative available of his deposition testimony, a deposition that included hours of examination by defense counsel. (*See generally* Dkt. 244, Trial Tr. at 476:1–477:8, 479:4–21, 484:20–485:12.)

In their Rule 59 motion for a new trial, Defendants challenge the Court's ruling by reasserting essentially the same argument that formed the basis of their objection at trial, that Hill's counsel did not exercise reasonable diligence in attempting to procure White's presence before seeking to use his deposition testimony. Defendants claim that Hill's counsel waited until the eve of trial to subpoena Hill and assert that it is not clear that he was ever properly served. Defendants further argue that allowing the testimony via deposition was extremely prejudicial, given that the credibility of White's testimony, in particular his claim that Thomas induced his identification of Hill, was a central issue in the case.

The Court disagrees and finds that it did not err in allowing Hill to present White's testimony via deposition. As the Court noted on the record at oral argument, while Hill's counsel could have perhaps attempted to find White earlier, they had been making reasonable attempts through an investigator to locate White at least as of June 8, 2023, or two weeks before trial. While Defendants suggest that it should have been obvious to Hill's counsel to locate White at Kellogg's address, there is no indication in the record that Hill's counsel should have known he would be located there, given that none of the tracing for White had turned up any accurate location. The Court does not find it to be a reasonable assumption that adult sons always reside with their mothers such that Hill's counsel should have attempted to serve White at Kellogg's address. In fact, Defense counsel only identified White at Kellogg's address by happenstance because White happened to be present when Defendants served Kellogg with a subpoena, and Defense counsel represented to the Court that they only learned White was there on Wednesday June 21, just two days before trial was set to begin. Upon learning of White's possible location on Friday June 23, 2024, Hill's counsel acted diligently to successfully serve him with a subpoena the next day.

While Defendants argue in conclusory fashion that Hill and his counsel should have done more, it is important to emphasize the unusual circumstances and timing under which this dispute arose. Defendants did not raise any objection to White's testimony being presented via deposition until trial had already begun on June 23. And it is not as if they did not have notice that this might be an issue; Hill's counsel had flagged that they were having difficulty locating White on June 8, more than two weeks earlier, and expressly stated they intended to rely on his deposition testimony if they could not subpoena him. Defendants raised no objection at that time to presenting White's testimony by deposition, nor did they raise any objection to the use of deposition testimony at the continued pretrial conference June 20. If Defendants were concerned about the potential prejudice

to their case of not having White appear in person, they could have raised the issue and pressed Hill's counsel on whether they were doing enough to locate White. Instead, Defense counsel simply indicated that they were in the process of reviewing Hill's deposition designations. As of June 20 then, it appeared that both sides agreed that White was unavailable, and that Defendants had no objection to introducing his testimony via deposition. Hill's counsel can hardly be faulted for a lack of diligence in locating White between June 8 and June 23, when their prior searches had turned up no information and it seemed to be a foregone conclusion that Defendants would agree to using his deposition. Put another way, the fact that Defendants raised a last-minute objection because they happened to learn White's location by pure luck on the eve of trial undercuts their claims that Hill's counsel acted without reasonable diligence up to that point. Defendants' luck in sighting White does not equate to Hill's lack of diligence.

And regardless of counsel's diligence leading up to trial, there is no indication that White would have voluntarily complied with a subpoena even if he had been served earlier. Hill submitted a declaration from his process server indicating that when he first attempted to serve White at Kellogg's address on June 24, 2023, a man matching White's description, and a woman who appeared to be Kellogg, both came to the door and began swearing at the process server and telling him they would not be testifying. (Dkt. 232.) Based on this record, the Court was within its discretion to conclude that Hill had acted diligently to attempt to secure White's appearance, but nonetheless could not secure White's testimony via subpoena.[6] This was all that Rule 32 required.

---

[6] The process server apparently did not initially leave the subpoena with White after speaking with him and Kellogg, as the witness check had the server's personal information on it, and he states in his declaration that he feared for his safety in leaving that information with White. (Dkt. 232 at 1.) The server thus left and returned later in the day to leave the subpoena on the door of the residence, with the identifying information redacted on the check. Defendants suggest that this method of process did not comply with the service requirements of Rule 45. But whether the process server's actions constitute proper service of the subpoena is of no moment. Rule 32(a)(4)(D) does not require successful service of a subpoena to apply. All that matters is whether counsel made a reasonably diligent attempt to secure a witness's appearance by subpoena. The Court finds this requirement was met, and it is evident that White was aware of the subpoena and request to testify but had no intention of complying.

Again, the Court recognizes that Hill's counsel could have started the process to locate and subpoena White earlier. Had he done so, there might have been more options to secure his appearance, including using the Court's authority to issue a warrant for his arrest. But hindsight is 20/20, and the fact that Hill's counsel might have done more does not mean that the Court's finding that the requirements of Rule 32 were satisfied was an error. *See Thomas*, 604 at F.3d at 308 ("[T]hat we may have done things differently in hindsight is beside the point. The court had broad discretion to determine whether the plaintiff's actions satisfied Rule 32's requirements."). Indeed, the Seventh Circuit in *Thomas* specifically rejected the idea that Rule 32 requires the Court to take a particular action such as issuing an arrest warrant before admitting testimony via deposition. *See id.* ("Neither Rule 32 nor our case law required the district court to issue an arrest warrant for [the witness] before admitting his deposition testimony."). The Court thus was not required to hold a show cause hearing or employ the U.S. Marshals to arrest White, either of which would have further delayed a trial that had already been delayed for several years due to the COVID-19 pandemic and a reassignment of judges. Rather, the Court had broad discretion to determine whether Hill's counsel had acted diligently under the circumstances but could nonetheless not secure the witness's appearance. The Court concludes that Hill's counsel met this obligation.

Finally, the Court recognizes the obvious point that there is a strong preference for live testimony over the reading of a deposition transcript, because the former allows a jury an opportunity to observe a witness's demeanor and to judge credibility. And the credibility of White's testimony was likely an important issue, as his testimony that his statement identifying Hill was fabricated was a key point of evidence in this case. In an ideal world, the Court does not disagree with Defendants that it would have been best for jurors to judge that testimony live. But Rule 32 already contemplates this preference for live testimony, as it only allows deposition

testimony to be used in the place of live testimony under certain circumstances. As long as those requirements are met, testimony by deposition is permitted.[7] Further, the Court notes that while the jury may not have been able to judge White's credibility in person, the testimony and claims of fabrication were not presented in a vacuum. The deposition designations were agreed to by Defendants, and included extensive questioning about the fact that White's testimony was inconsistent with his prior signed statement. And of course, there was testimony from multiple live witnesses, including Hill, who denied being present at the shooting, and the Defendant Officers and ASA Reardon, who all testified that White made his statement voluntarily. Thus, while the jury may have only heard White's testimony on paper, there was ample evidence and live testimony from which they could draw to assess and weigh the credibility of each witness to come to their conclusion on who to believe. That they believed White's paper testimony over the live testimony of Defendants does not mean that it was a prejudicial error to allow the testimony by deposition in the first place.

In sum, the Court concludes that this ruling does not constitute an error justifying a new trial.

## 2. <u>Statement and Photo of Elizabeth Kellogg.</u>

Second, Defendants claim that the Court erred in precluding them from introducing a signed statement from Kellogg given to the HPD, and a photograph of Kellogg holding the statement. Kellogg purportedly signed the written statement during the HPD interrogation of her

---

[7] It should also be noted that, if Defendants had concerns that White's credibility before the jury would be a key issue in this case, they had available the option to take his deposition by video, to preserve his demeanor and reactions. *See, e.g., Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204–05 (1st Cir. 1988) (noting skepticism over the party's claim of prejudice from depositions being used at trial, because "[t]o the extent that they believed it was critical to capture the demeanor and appearance of the witnesses for the jury, they could have videotaped the depositions."). The Court understands that it was a different defense attorney who took the deposition of White years prior to the issue arising at trial, and that video depositions may not always be financially feasible. But the fact that Defendants chose not to take that option here does undercut their argument that White's credibility was so critically important for trial.

son, White, in March 2014. White was a minor at the time, and the statement indicates that Kellogg was present for White's interview with Thomas and Reardon. (*See* Dkt. 151–14.) During pretrial proceedings, Hill objected to the statement and associated photograph as irrelevant under Federal Rule of Evidence 401, because Kellogg was not present during the entire time White was interviewed. Hill additionally objected that the statement was inadmissible hearsay under Federal Rules of Evidence 801 and 802, and regardless was unfairly prejudicial and should be excluded under Federal Rule of Evidence 403. The Court ultimately sustained Hill's objection on the grounds that the statement and photograph were inadmissible hearsay, and additionally were unfairly prejudicial.

Defendants claim in their Rule 59 motion that this ruling was an error. First, Defendants argue that the statement was not hearsay because it was not offered for the truth of the matter asserted but was rather offered for its effect on the listeners (Thomas and Readon) and as evidence that Kellogg was at the police station during White's interview. (Dkt 252 at 10.) Defendants additionally argue that the photograph was not hearsay at all because it was not a statement. (*Id.*) Finally, Defendants argue that the probative value of the photograph and statement were not substantially outweighed by any prejudice.

The Court disagrees with Defendants and finds no error in its rulings. Kellogg indicates in the statement that she was present "at all times" when White was interviewed, which is exactly what Defendants themselves admit they wanted to use the statement as evidence for—evidence that Kellogg was present at the police station while White was interviewed. The statement is thus classic hearsay: an out-of-court statement that a party intended to offer for the truth of the matter asserted in it. Fed. R. Evid. 801(c). And there are other assertions in Kellogg's written statement that Defendants plainly intended to introduce for their truth, including her assertion that White

29

gave his statements to police voluntarily and freely, and that there were no threats or promises made to induce his testimony. (*See* Dkt. 151–14.) The Court committed no error in excluding the statement as hearsay.

As to the photograph of Kellogg holding the statement, the Court acknowledges that it is not apparent that the photograph itself qualifies as a "statement" under the hearsay rules, which define a statement as a person's "oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed R. Evid. 801(a); *see, e.g.*, *CDx Holdings, Inc. v. Heddon*, No. 3:12-CV-126-N, 2012 WL 13018986, at *5 (N.D. Tex. Nov. 9, 2012) ("ordinarily a photograph is not hearsay."). While there may be some circumstances where a photograph could be considered nonverbal conduct intended as an assertion, the Court need not resolve that issue here,[8] because the Court did not exclude the photograph and statement solely on hearsay grounds, but also relied on Rule 403. That Rule provides that the Court may exclude otherwise relevant evidence if its probative value is "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, the photograph's probative value is minimal, as its only relevance is showing that Kellogg prepared the written statement, which is itself inadmissible hearsay. On the other hand, allowing Defendants to present the photograph of Kellogg holding a statement, the contents of which are inadmissible hearsay, would present a substantial risk of unfair prejudice to Hill and risk confusing and misleading the jury. Finally, the photograph was needlessly cumulative, as Defendants introduced testimony from

---

[8] There is a strong argument that the photograph of Kellogg holding her signed statement was in fact intended as an assertion, i.e., an assertion that she signed the written statement that she is holding in the photo, and therefore could nonetheless be considered hearsay. The parties' briefing does not go into this issue, and so the Court makes no determination either way.

Thomas and Reardon that Kellogg was present and signed White's statement, which was separately introduced into evidence.

This last point about the other testimony and evidence showing that Kellogg was present provides further grounds for rejecting Defendants' arguments: any error in excluding the evidence of Kellogg's statement and the photograph was harmless. Defendants elicited other testimony and submitted other evidence indicating that Kellogg was present during White's interrogation. Thus, even if it were an error for the Court to exclude Kellogg's statement and the photograph, the fact of Kellogg's presence was before the jury, and therefore any error was harmless and could not have altered the result.

### 3. Evidence Related to Hill's Criminal Trial

Finally, Defendants argue that the Court erred by permitting Hill to introduce certain evidence regarding what evidence was presented, or not presented, at his criminal trial. During his civil trial, Hill's counsel asked several witnesses about evidence and witnesses introduced during Hill's one-day criminal trial in March 2017. In particular, Hill testified that there was no McDonald's video shown at his criminal trial, that nobody testified that he was observed in a McDonald's surveillance video with White and Johnson, and that there was no testimony about a coat recovered from Hill's vehicle after the shooting. (Dkt. 243 at 71:1–9.) Thomas also testified, in response to questions from Hill's counsel, that he did not testify about the McDonald's video at Hill's criminal trial. (*Id.* at 185:5–6.)

During pretrial conferences, and during the questioning of Hill and Thomas at trial, Defense counsel repeatedly objected that any testimony regarding what happened at Hill's criminal trial was irrelevant to his claims of unlawful pretrial detention and malicious prosecution. Defendants maintained that the decisions as to what evidence is presented at a criminal trial are

solely within the discretion of the ASA that tried the case, not the Defendant Officers, and thus testimony about whether certain evidence was introduced is not relevant to the question of whether the Defendant Officers had probable cause to arrest and detain Hill. The Court overruled the objection, finding that whether certain evidence was presented at the criminal trial was relevant to how probative that evidence was for establishing probable cause and the Defendant Officers' belief as to whether probable cause existed.

In their Rule 59 motion, Defendants repeat their same objections made at trial. The Court again rejects Defendants' arguments and finds that there was no error in its ruling that the evidence related to Hill's criminal trial was relevant to the issue of probable cause. It is undisputed that ASA Murillo only approved charges against Hill after Thomas obtained the McDonald's video, and Thomas specifically told Murillo that Hill was in the video. Further, Defendants expressly argued to the jury, and indeed argue again in their post-trial motions, that the jacket recovered from Hill's car was a piece of evidence supporting probable cause to arrest and detain Hill. (*See* Dkt. 251 at 9.) The McDonald's video and jacket were thus two pieces of evidence that, at the time of Hill's arrest, allegedly supported probable cause to believe Hill had committed a crime. The fact that that this evidence was not ultimately used at Hill's trial is probative of whether it actually had value in establishing that Hill committed the crime for which he was charged, which goes to whether the Defendant Officers acted reasonably in relying on that same evidence as a basis for probable cause. In other words, the fact that certain evidence purportedly establishing probable cause was not used at trial is one piece of evidence that goes towards the larger question of whether the Defendant Officers believed, based on all the evidence before them, that they had probable cause to arrest and detain Hill. Finally, to the extent there was any potential prejudice from the evidence, Defendants were able to cure this by presenting evidence that the Defendant Officers were not

involved in the decisions made by the ASA as to what evidence to present at trial. Defendants also called ASAs Reardon and Murillo, and therefore had ample opportunity to address the question of why the evidence was not ultimately used.

In sum, the Court finds no error in its ruling admitting the evidence related to Hill's criminal trial.

### C. Remittitur of the jury damages award is not warranted.

Finally, Defendants argue that the jury artificially inflated the damages award in response to one of the Court's instructions, which they contend entitles them to a new trial, or alternatively a remittitur of the damages award. In particular, Defendants take issue with the Court's instruction on the tax consequences of a damages award in Hill's favor. At closing argument, Hill's counsel asked the jury to award Hill $2,500,000.00 in compensatory damages as compensation for the two and a half years he was incarcerated and the emotional distress he continued to suffer as a result of that incarceration. (Dkt. 247 at 1012:18–23.) The jury instruction on compensatory damages, which largely tracked the Seventh Circuit's pattern instruction 7.26, did not itself mention taxation of any damages award. Instead, the issue arose when the Court received a question from the jury foreperson during deliberations, which asked: "Would the plaintiff have to pay taxes on the award of compensatory damages?" (*Id.* at 1046:5–6.) Hill's counsel asked the Court to instruct the jury that a "portion" of a compensatory damages award "may" be subject to taxation, and Defense counsel objected to any further instruction, requesting that the Court simply advise the jury that they had all the information and instructions they needed.

After hearing argument from the parties, and independently researching the issue, the Court agreed with Hill's proposed response to the jury's question. The Court therefore instructed the jury as follows:

> The Court: So I was handed a note from your foreperson . . . which states: "Would the plaintiff have to pay taxes on the award of compensatory damages?" And I wanted to briefly answer your question on the record. And yes, the plaintiff may have to pay taxes on a portion of any award of compensatory damages. That is your instruction. You have the rest of your instructions. So please continue with your deliberations.

(*Id.* at 1051:15–23.) The jury then returned to their deliberations and, about 30 minutes after the Court answered their question, ultimately reached a verdict in favor of Hill, awarding him $3,000,000.00 in compensatory damages. (Dkt. 250 at 1055:5–6.)

In their Rule 59 motion, Defendants argue that the jury's increase of $500,000.00 over what Hill requested was in direct response to the Court's instruction on taxation. Defendants maintain that the Court's instruction caused the jury to award Hill more damages to cover any amount he might pay in taxes, which inflated his damages beyond what was warranted by his injuries.

A district court's response to a question from a jury is a matter of discretion, and the Seventh Circuit has outlined three considerations for evaluating whether a court abuses its discretion in providing a supplemental instruction in response to a question: "(1) whether the instructions as a whole fairly and adequately treat the issues; (2) whether the supplemental instruction is a correct statement of the law; and (3) whether the district court answered the jury's questions specifically." *Morgan v. City of Chicago*, 822 F.3d 317, 342 (7th Cir. 2016). In general, "the district court's obligation is to dispel jury confusion on the requirements of the law." *Lindsey v. Macias*, 907 F.3d 517, 522 (7th Cir. 2018). "[W]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *United States v. He*, 245 F.3d 954, 961 (7th Cir. 2001) (citation omitted).

Here, the Court rejects Defendants' contention that its supplemental instruction was an error entitling them to a new trial or remittitur of the damages award. Defendants notably fail to

cite to any authority suggesting that the Court's instruction on the tax consequences of the jury award was an inaccurate statement of the law, or that the Court did not have authority to instruct the jury on taxation generally. Regardless, the Court finds that its statement that a portion of the compensatory damages award for Hill may be subject to taxation was a correct statement of the law. As Hill outlines in his briefing, and as the Court discussed on the record at trial outside the presence of the jury, compensatory damages received from physical injuries are generally not subject to income taxation, but damages received for emotional distress can be subject to taxation. (Dkt. 254 at 13) (citing 26 U.S.C. § 104(a)(2)). Hill presented evidence of physical attacks and injuries during his wrongful incarceration, though the substantial part of his claim for damages was based on the emotional pain and suffering and loss of liberty. Based on this evidence, at least some portion of Hill's damages may be subject to taxation, which was what the Court instructed.

As to the Court's authority to offer the instruction, Defendants argue that the case cited by the Court at trial, *Van Bumble v. Wal-Mart Stores, Inc.*, and the additional cases cited by Hill in his briefing, speak only to the Court's authority to offer instructions when an award *is not* subject to taxation. (Dkt. 255 at 8.) But there is no principled reason to believe that the Court would be permitted to instruct a jury when damages are not taxable, but would not be permitted to instruct a jury of the opposite fact when damages are taxable. Rather, the Seventh Circuit authority stands for the principle that such instructions on taxation are not an error as long as they state the applicable law correctly and are not misleading. *See*, *e.g.*, *Van Bumble v. Wal-Mart Stores, Inc.*, 407 F.3d 823, 826 (7th Cir. 2005). The Court's statement that a portion of the award may be subject to taxation was correct and not misleading, as it accurately appraised the jury that some of the damages may be subject to taxation.[9]

---

[9] Indeed, as Hill points out in his briefing, the Court's instruction may have benefited Defendants by clearing up the jury's confusion about the tax consequences of a damages award. Had the Court ignored the jury's question as

Additionally, to the extent that Defendants argue that the instruction led the jury to award an irrational or arbitrary damages amount, this argument fails as well. The mere fact that a jury awards more damages than requested by a plaintiff does not itself render the award excessive to the point that remittitur is required. Instead, the Seventh Circuit has set forth three factors to guide the Court's analysis to determine whether remittitur is warranted: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).

Defendants fail to directly address these factors, though they indirectly advance an argument on the second factor by contending that the jury's award was not rationally connected to Hill's damages, but rather was inflated by $500,000.00 based on the Court's tax instruction. But even if that were true, the Court does not find that would warrant reduction based on the other applicable factors. Defendants make no argument that the award of $3,000,000.00 was "monstrously excessive" or that it is not comparable to awards made in similar cases involving unlawful detention and malicious prosecution. Hill, on the other hand, has provided citations demonstrating that an award of $3,000,000.00 in compensatory damages for two and a half years of unlawful detention is roughly comparable to similar cases, and therefore not monstrously excessive. (Dkt. 254 at 15) (collecting cases); *see, e.g.*, *Kuri*, 990 F.3d at 574 (verdict of $4 million for almost three years in pretrial detention); *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) ($9 million for four years in prison). The Court thus finds that the award was not so excessive that remittitur is warranted.

---

Defendants requested, the jury may have mistakenly believed that Hill's entire award would be subject to taxation and increased his damages even further.

**Conclusion**

For all the foregoing reasons, Defendants' motions for judgment as a matter of law and

for a new trial or remittitur are denied.

ENTERED:  5/2/24

Nancy L. Maldonado

United States District Court Judge